NORWEST BANK MINNESOTA, National Association, as Trustee for The LB Commercial Mortgage Trust, Mortgage Pass–Through Certificates Series, 1999–C1, Plaintiffs,

v.

BLAIR ROAD ASSOCIATES, L.P., United States Land Resources, L.P., Defendants.

Civ. No. 00–706 (WGB).

United States District Court, D. New Jersey.

March 21, 2003.

Philip Rosen, Zeichner Ellman & Krause, Newark, NJ, for Plaintiff.

Lawrence S. Berger, Berger & Bornstein, P.A., Morristown, NJ, for Defendant.

**REVISED OPINION**

BASSLER, District Judge.

This is a contested mortgage foreclosure action. Because the parties could not resolve the issues in dispute, the Court held an evidentiary hearing on June 6, 2002, August 1, 2002 and August 14, 2002. The Court's jurisdiction in this case is pursuant to 28 U.S.C. § 1332 (diversity of citizenship). This is a Revised and Amended Opinion. After delivering its original Opinion dated March 4, 2003, the Court provided Counsel with a Judgment reflecting the Result reached by its Opinion. Counsel were asked to forward any objections to the Court and opposing counsel within five days of receipt of the Opinion. In addition, the Court held a hearing on March 19, 2003 to resolve those objections. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

I. *PROCEDURAL HISTORY*

On April 6, 1999 Lehman Brothers Holdings, Inc. ("Lehman") loaned to the defendant Blair Road Associates, L.P. ("Blair Road") $4,325,000.00 (the "Loan"). Blair Road signed a Promissory Note (the "Note") which was secured by a Mortgage and Security Agreement (the "Mortgage") on Blair Road's property at 600 Blair Road, Carteret, New Jersey (the "Property"). Norwest Bank Minnesota, N.A. ("Norwest" or "Plaintiff") (Wells Fargo Bank Minnesota, National Association is now the successor-in-interest to Lehman with respect to the Loan[1]). The defendant United States Land Resources, L.P. ("USLR") guaranteed certain liabilities of Blair Road. The Note is a non-recourse obligation of the defendants, except for real estate taxes and rents received by Blair Road and not turned over to Norwest after the declaration of default.

By letter of December 23, 1999 Norwest declared a default and accelerated the Loan.[2]

---

1. The Affidavit of Darryl Black of January 2, 2002 certifies that as the result of an acquisition the name of the Plaintiff has changed to Wells Fargo Bank Minnesota, National Association as Trustee for the LB Commercial Mortgage Trust, Mortgage Pass–Through Certificates Series, 1999–C1. For the sake of convenience, the Opinion will refer to the Plaintiff as Norwest.

2. Although the Rent Receiver has yet to file a Final Accounting it did submit at Plaintiff counsel's request "An Accounting or Cash Flow Analysis including an Accounts Payable itemization." *See* Aff. of Michael A. Traman-

By Order of February 29,2000 the Court appointed Harold H. Goldberg the Rent Receiver.

On December 12, 2001 the Court granted that part of plaintiff's motion for summary judgment striking most of Blair Road's affirmative defenses and directing that Norwest submit an affidavit in support of final judgment.

In addition to submitting affidavits [3], Darryl J. Black, a Vice President of GMAC Commercial Mortgage, Special Servicer for Norwest, testified as did Louis Mont,[4] an employee of USLR, the general partner of the defendant Blair Road and the Guarantor. The Court also permitted Blair Road to take the depositions of Mr. Black in order to clarify certain calculations contained in his affidavits in support of the foreclosure judgment.

The evidentiary hearing concluded on August 14, 2002.

## II. *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

Before the Court sets forth its findings, it wishes to elaborate on the procedure it utilized to arrive at its factual determinations.

The Court invited the parties to submit proposed findings of fact and conclusions of law, and responses thereto, after the close of testimony and argument in this case. The Court has carefully reviewed the proposed findings, the documentary evidence, the affidavits, and the testimony adduced at trial. The Court, having considered this array of information, sets forth its findings of fact based on its independent review of the evidence, and utilizes the parties' proposed findings of fact merely to assist the Court in organizing this information. *See* 9A Wright & Miller, *Federal Practice and Procedure* Civil 2d § 2578 (1995) ("Proposed findings submitted by counsel are no more than informal suggestions for the sole purpose of assisting the court.")

The Court bases its findings of fact on its careful consideration of the testimony adduced at the evidentiary hearing and a review of the affidavits and documentary evidence submitted, as well as the logical inferences to be drawn from them. In evaluating the evidence of record, the Court undertook an individualized assessment of the credibility of each witness, and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility.[5]

### A. *The Terms of the Mortgage Note*

The terms of the Mortgage Note provide for the following categories of damages in the event of a default:

1. Plaintiff is entitled, in connection with the entry of final judgment, to receive the following:

(a) A sum representing the principal balance of the loan. (Paragraph 3(c) of the Note; p. 2).

(b) Accrued interest on the loan. (Paragraph 3(b) of the Note; p. 2).

---

to, President of Harold H. Goldberg & Co., Inc. The Rent Receiver also prepares a monthly operating statement.

3. Jan. 2, 2002; May 15, 2002; Aug. 16, 2002; Nov. 4, 2002; and Dec. 30, 2002.

4. Mont also submitted certifications dated May 16, 2002 and Sept. 20, 2002.

5. To the extent that any of the findings of fact might constitute conclusions of law they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact they are adopted as such.

(c) Default interest. (Paragraph 4 of the Note; p. 2).

(d) A prepayment premium. (Paragraph 5(c) of the Note; pp. 4–5).

(e) Late charges. (Paragraph 8 of the Note; p.5).

(f) Advances made during the pendency of the foreclosure action. (Paragraph 3(d) of the Note; p. 2).

(g) Reasonable attorneys' fees. (Paragraph 17 of the Note; p. 7).

B. *Calculation of Amounts Due According to the Mortgage Note Prior to Any Credits*

The Court calculates that the amount due the plaintiff before consideration of any credits(and the Defendants' objections and legal arguments) is $5,171,057.00:

(1) *Principal Amount*

The principal balance of the loan as of December 15, 2002 is $4,206,151.10. (Darryl J. Black Aff. 12/30/02 at ¶ 3, Attach. Ex. 1.)

(2) *Accrued Interest*

The accrued interest from October 1, 2002 to January 1, 2003 is $85,623.22. (Black Aff. 12/30/02 at ¶ 4).

(3) *Default Interest* [6]

The Note provides that upon the occurrence of an Event of Default, the Note accrues default interest, until the Event of Default is cured or the Note is paid, at a rate (defined in the Note as the "Default Rate") equal to (i) the greater of (a) the Applicable Interest Rate plus three percent (3%) and (b) the Prime Rate (as defined in the Note) plus four percent (4%) or (ii) the maximum interest rate that the

Borrower may by law pay, whichever is lower. (*See* Curt Spaugh Certification 2/11/00, Attach. Ex. A. Promissory Note ¶ 4.)

Under the Note the Default Rate is 10.88% (the Applicable Interest Rate under the Note, 7.88% plus 3%) or the Citibank, N.A. prime rate plus 4 percent, whichever is greater. (Promissory Note ¶ 4; Black Aff. 1/2/02 at ¶ 2(b), Exhibit C attached.)

The default interest is $528,637.22 pursuant to the formula set forth in Paragraph 4 of the Note. (This is calculated from December 1, 1999 [month of default] through December 15, 2002.) (Black Aff. 12/30/02 at ¶ 6.)

(4) *Prepayment Premium*

The prepayment premium totals $337,871.37. (Black Aff. 12/30/02 at ¶ 5, Attach. Ex. 2.)

(5) *Late Charges*

The late charges total $12,774.01 (Black Aff. 12/30/02 at ¶ 7.)

(6) *Legal Fees*

Utilizing R. 4:42–9(a)(4) of the Rules Governing the Courts of New Jersey, the Court has determined that the Plaintiff is entitled to a fee of $48,867.00 raised and paid out of the mortgaged premises.

C. *Calculation of Credits Due the Defendants*

The Court calculates that defendants are entitled to the following credits in the total amount of $299,351.00:

(1) A credit of $96,232.72. This figure represents the amount diverted by Plain-

---

**6.** Defendants did not submit counter-computations for default interest based upon the formula set forth in the Note but instead offered alternative "options" analyzed and rejected by the Court under sections II. E(1)-(2) of this Opinion.

tiff to pay for legal fees. Had the amount not been diverted, the Rent Receiver would have applied it to the defaulted loan.[7] Therefore the amount should be credited to Defendants before the Court calculates attorney's fees under N.J.Ct.R. 4:42–9(a)(9) to avoid allowing the Plaintiffs a windfall.

(2) $170,133.29 in the reserve account. (Black Aff. 12/30/02 at ¶ 11; *see also* Black Test. 6/6/00 Tr. at pp. 83–85.[8])

(3) A credit of $25,631.66 reflecting the current suspense escrow balance. (Black Aff. 12/30/02 at ¶¶ 10–11, Attach. Ex. 1.)

(4) A credit of $3,264.00 for the interest on a missing $60,000 check. The missing check, dated February 22, 2002, was neither presented for payment, nor returned. (Tramontano Aff. 3/17/03 at ¶ 3). On June 20, 2002, a duplicate check was issued for $60,000.00, and was paid on or about June 26, 2002. (*Id.* at ¶ 4). Because Plaintiffs were in the best position to determine the whereabouts of the missing check, Defendants are entitled to a credit for the interest that accrued as a result of the delay in crediting the $60,000 to Plaintiffs. (Mont Test. 8/1/02 Tr. at 10:4–16, 12:11–13).

(5) Credit for interest on escrow account of $4,088.94.

### D. *Net Amount Due Plaintiffs*

The amount due Plaintiffs according to the loan documents and applying the above credits is $4,871,706.00. By adding counsel fees of $48,867.00 to this number, we get the net amount due Plaintiffs of $4,920,573.00.

### E. *Defendants Objections* [9]

### (1) *The Default Interest Is An Unenforceable Penalty*

■ Paragraph 4 of the Promissory Note provides:

> Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a rate (the "Default Rate") equal to (i) the greater of (a) the Applicable Interest Rate plus three (3%) and (b) the Prime Rate (as hereinafter defined) plus four percent (4%) or (ii) the maximum interest rate that Borrower may by law pay, whichever is lower.

Defendants make several arguments that this provision is a penalty and unenforceable. First they argue that a Default Rate interest clause in the Note which is tied to the greater of two formulas, one based on a fixed rate of 10.88% (7.88% + 3%) and the other based on prime plus 4%,

---

7. The PMI section of loan history, annexed as Ex. 1 to the Black Affidavit of August 16, 2002 reflects that the total amount of reimbursement from receivership funds was $115,145.82. But only $96,232.72 reflected non-court approved legal fees. The figure of $115,145.82 has to be reduced by $18,913.10, representing $9,950.00 for two appraisals conducted on October 16, 2000 and October 3, 2002; $4,410.00 for two environmental reports conducted on July 10, 2000 and January 24, 2002; and travel and site inspections costs of $4,553.10 conducted on April 13, 2002 and March 26, 2001. ($115,145.82–$18,913.10 = $96,232.72)

8. Mr. Black testified that the purpose of the reserve account is to hold amounts deposited in connection with the loan for tenant improvements, leasing commissions and repairs to the property. If during the term of a loan the funds are not used, they are returned to the borrower.

9. Because Defendant's Proposed Findings of Fact and Conclusions of Law were submitted prior to Black's last affidavit of Dec. 30, 2002, the numbers used in Defendant's arguments reflect earlier calculations. The Court's determination of the final figures does not affect the legal analysis or legal conclusions.

is per se penal and not intended as a reasonable forecast of just compensation for harm caused by the breach. Since either formula is presumably a reasonable forecast of just compensation the Lender should not be permitted to impose a higher Default Rate. Defendants further contend that the sum of $485,806.36 is far in excess of any reasonable projection or forecast of the cost of administering and managing a defaulted asset and is therefore a penalty, which should be disallowed.

At the very least, Defendants argue, to save the clause the lower of the two formulas should be used: 10.88% at the time of the Default and acceleration. If that were the case, the amount of the default interest would be reduced by $132,956.34 to $352,850.02 instead of the amount being sought by Norwest—$485,806.35.

Next defendants argue that a Default Rate based on prime plus 4% could far exceed the contract rate (7.88%) depending on what the prime might be. Defendants point out that at times the Default Rate was 5.62% above the contract rate. Such an increase, defendants argue, is closer to the percentage of increase found unreasonable and unenforceable in *Feller v. Architects Display Buildings, Inc.*, 54 N.J.Super. 205, 213–14, 148 A.2d 634, 639 (App.Div.1959)(invalidating increase from 17% rate to a 32.87% rate.)

Next Defendants argue that the amount of default interest should be no greater than the amount allowed by the Supreme Court of New Jersey in *MetLife Capital Financial Corp. v. Washington Ave. Associates L.P.*, 159 N.J. 484, 732 A.2d 493 (N.J.1999). In *MetLife*, the court, reversing the Appellate Division, upheld a trial court's determination that a 3% increase above the non-default interest rate of 9.55% (12.55%) was a reasonable default interest rate. *Id.* at 501, 732 A.2d 493. The defendants calculated this amount to

be $112,500.00 (*See* Mont Test. 8/1/02 Tr. at 19: 17–19; Ex. D–6, Schedule 7). According to this theory, the Norwest default interest figure of $485,806.36 should be reduced to $112,500.00.

Alternatively Defendants argue that the default interest rate should be reduced to 3% over the contract rate, the increase considered reasonable in *MetLife*. In that event the sum of $485,806.36 would be reduced by $163,306.36 resulting in default interest of $322,500.00. (*See* Mont Test. 8/1/02 Tr. p. 20–21, 16. Ex. D–6, Schedule 7.)

The defendants present still another alternative argument: if the Default Rate is reduced to a rate proportionately equivalent to the relation between the contract interest rate and the default interest rate approved in *MetLife*, the default interest rate in this case would equal 2.48% over the contract rate, rather than 3% over the contract rate. (*See* Mont Test. 8/1/02 Tr. p. 21:17–22:7; Ex. D–6, Schedule 8.) Accordingly Defendants argue that if a default interest rate of 2.48 % over the contract rate (7.88% + 2.48% = 10.36%) is awarded, the sum of $485,806.36 should be reduced by $84,967.53 to $400,838.83. (*See* Mont Test. 8/1/02 Tr. 21:17–22:11; Exh.D–6, Schedule 8.)

Finally defendants argue that even if the dual formula Default Rate is not penal, the Note does not provide that once a Default Rate is imposed under either the Prime plus 4% or the fixed 10.88%, the Lender can subsequently change the Default Rate to the higher of the two. Since Norwest initially elected a prime based default rate (Defendant's Proposed Findings of Fact and Conclusions of Law at ¶¶ 36–39), it improperly changed the default rate as of June 28,2001 from a prime based rate to a fixed rate of 10.88% (Applicable Rate, 7.88% + 3%), resulting in a higher rate of default interest. (Black Aff. 1/2/02, Ex. C.)

Defendants argue that the amount of excess default interest charged during the period since June 28, 2001 by using the formula producing the higher number is $49,918.64. (*See* Mont Test. 8/1/02 Tr. 18:5–19:7; Ex. D–6; Schedule 5.) Therefore the amount of default interest sought by Norwest should be reduced from $485,806.36 to $435,887.72.

The Court finds all of these arguments unpersuasive. In *MetLife,* the Supreme Court of New Jersey, by reversing the Appellate Division, validated a default interest rate of 12.55% on a $1.5 million dollar loan. 159 N.J. 484, 732 A.2d 493. The note in that case provided that in the event of declaration of default the interest rate on the unpaid principal balance would not be the non-default interest rate of 9.55%, but rather a default rate. The default rate of interest was:

the greater of five percent (5%) per annum in excess of the 'prime rate' as designated by Chase Manhattan Bank, N.A., from time to time, or fifteen percent (15%) per annum; provided, however, that such Default Rate shall not exceed the maximum rate allowable under law.

*MetLife,* 159 N.J. at 489, 732 A.2d 493.

In response to MetLife's foreclosure action against Washington Avenue and its general partner Lawrence S. Berger (also a principal in the defendants before this court), Washington Avenue filed an answer challenging the fifteen percent default rate. The trial court considered the default rate a penalty but concluded that a default rate of 12.55%, three percent above the non-default rate of 9.55% percent was reasonably related to actual damages. The Appellate Division invalidated the 12.55% default rate and remanded the matter to permit MetLife to present proof of the actual damages sustained by reason of the default. Because *MetLife* did not appeal the trial court's decision to reduce the default rate and the Appellate Division did not consider the validity of a fifteen percent rate, only the rate of 12.55% was before the Supreme Court.

▮ The Supreme Court recognized that:

default charges are commonly accepted as a means for lenders to offset a portion of the damages occasioned by delinquent loans. As with the costs of late payments, the actual losses resulting from a commercial loan default are difficult to ascertain. The lender cannot predict the nature or duration of a possible default given many possible causes of borrower delinquencies. Nor is it possible when the loan is made to know what market conditions might be ten or fifteen years hence and, thus, what might be recovered from a sale of the collateral.

*MetLife,* 159 N.J. at 501–02, 732 A.2d 493. Where enforceable, a stipulated damages clause is referred to as liquidated damages. *Id.* at 493, 732 A.2d 493. Nevertheless such a clause requires judicial scrutiny because it may constitute an oppressive penalty and hence be unenforceable. *Id.* at 493, 732 A.2d 493.

▮ Contrary to the various alternative arguments urged upon this court by the defendants, the Supreme Court did not hold that the default interest rate of three percent above the non-default rate was a template by which default interest rates should be measured. Rather a default interest rate, like late fees, is subject to the test of reasonableness. "The overall single test of validity is whether the [stipulated damage] clause is reasonable under the totality of the circumstances." *Id.* at 493, 732 A.2d 493, *citing Wassenaar v. Panos,* 111 Wis.2d 518, 526, 331 N.W.2d 357, 361 (Wis.1983). While not any one

factor is dispositive, the totality of the circumstances that a trial court should consider in assessing the reasonableness of a stipulated damages clause include among other things "the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties." *Id.* at 495, 732 A.2d 493 *citing Wasserman's v. Township of Middletown*, 137 N.J. 238, 250–54, 645 A.2d 100, 106–09 (1994).

■ Adopting the "modern trend" the reasonableness test is applied either at the time the contract is made or when it is breached. *Id.* at 502, 732 A.2d 493 (citation omitted).

■ Before evaluating the reasonableness of the default interest rate in this case, it is important to note that a default interest rate provision is presumptively reasonable and it is the defendants who have the burden of proving its unreasonableness. "Liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable and the party challenging the clause bears the burden of proving its unreasonableness." *Id.* at 496, 732 A.2d 493.

First of all the provision for the default rate of interest tied to the greater of two formulas is in a commercial contract that was negotiated between financially experienced parties. During the evidentiary hearing Mr. Berger, a practicing attorney, demonstrated a very high degree of sophistication in the area of mortgage lending.[10] Indeed Mr. Berger, the principal in the defendant companies before the court, was the general partner in Washington Avenue Associates, the defendant in the *MetLife* case. The note in *MetLife* also

contained a clause tying the default rate to the greater of fifteen percent (15%) or five percent (5%) above the "prime rate." Although given the opportunity, the defendants offered no evidence that a default rate of interest based on a floating rate and the other based on a fixed rate is anything other than an accepted commercial practice intended to be "a reasonable estimate of the potential costs of administering a defaulted loan, and the potential difference between the contract interest rate and the rate [Norwest] might pay to secure a commercial loan replacing the lost funds." *Id.* at 501, 732 A.2d 493.

■ Defendant argues that "Norwest has offered no evidence to justify a minimum 10.88% Default Rate when the prime or market rate alternative formula for the Default Rate, which it concedes is a reasonable forecast of just compensation for damages caused by the breach, would result in a lower Default Rate than 10.88%." (Defendants' Proposed Findings of Fact and Conclusions of Law # 38). This is an attempt to shift the burden of proving unreasonableness from the party challenging the clause. Absent evidence from the defendants the court cannot say that a provision for providing an alternative formula for calculating a default rate of interest is per se penal rather than a commercially reasonable estimate of the potential costs of administering a defaulted loan. As the Supreme Court noted in *MetLife*, the actual losses resulting from a commercial loan in default are difficult to ascertain. The lender cannot predict the nature or duration of a possible default given many possible causes of borrower delinquencies. "Nor is it possible when the

10. The file of GMAC CM, the Special Servicer on behalf of Norwest, contains Reports of twenty-five foreclosure actions commenced against Mr. Berger, USLR, and USLR's related entities as well as judgments totaling 17 million dollars against them. (*See* Supplemental Certification of Curt Shaw, Assistant Manager of GMAC CM, Feb. 23, 2000 at ¶¶ 12 & 13.)

loan is made to know what market conditions might be ten or fifteen years hence and, thus, what might be recovered from a sale of the collateral." *MetLife,* 159 N.J. at 501–02, 732 A.2d 493. Using an alternative formula for determining default interest is simply an attempt to meet the vagaries of market conditions.

Certainly there was no evidence of any coercive intent by Norwest. Just the contrary. Darryl J. Black, Vice President of GMAC Commercial Mortgage Corporation, the Special Servicer on behalf of the plaintiff Wells Fargo Bank Minnesota, credibly testified that "default interest is to compensate the lender for the additional costs involved in managing a defaulted asset." (Black Test. 6/6/02 Tr. at 101:11–13.)

The default rate of interest for most of the computation period of approximately two and a half years is less than 12.55%, the rate validated by MetLife. At no time during the computation period did the default rate of interest exceed 13.5%. (*See* Black Aff. 8/16/02 Ex.3.) One percent interest over 12.55% for an approximately 7 month period, out of a 21/2 year computation period does not strike the court as coercive.

The Court concludes that applying the totality of the circumstances test, the default interest provision and the calculations made pursuant to that provision, do not constitute an oppressive penalty. The defendants have presented no evidence to overcome the presumptive reasonableness of the agreed upon provision nor any evidence of fraud, duress or other unconscionable acts on the part of Norwest.

Moreover defendants' argument that once having elected to calculate default by one formula Norwest cannot switch to a formula generating a higher default interest is without merit. Paragraph 4 of the Note explicitly provides that "the Lender shall be entitled to receive and Borrower

shall pay interest on the entire unpaid principal sum at a rate ... equal to (i) THE GREATER OF (a) the Applicable Interest Rate plus three percent (3%) and (b) the Prime Rate ... plus four (4%) or (ii) the maximum interest rate that Borrower may by law pay, whichever is lower ..." (emphasis added.)

(2) *The Default Interest Rate and Default Prepayment are Duplicative and Together Constitute a Penalty*

■ Norwest seeks to impose a prepayment premium, originally calculated to be $402,804.47 pursuant to paragraph 5(c) of the Note, which provides:

If a Default Repayment (defined herein) occurs prior to the date which is one month prior to the Maturity Date, Borrower shall pay to Lender (i) the entire Debt and (ii) an amount equal to the greater of:(A) three percent (3%) of the principal amount of this Note being prepaid; and (B) the present value of a series of payments each equal to the Payment Differential (hereinafter defined) and payable on each Monthly Payment Date over the remaining original term of this Note and on the Maturity Date discounted at the Reinvestment Yield (hereinafter defined) for the number of months remaining from the date of the Default Repayment (the:Repayment Date) to each such Monthly Payment Date and the Maturity Date.

Defendants argue that the "default" provisions of the Note should not be considered independently, citing *Spiotta v. Wilson,* 72 N.J.Super. 572, 179 A.2d 49 (App. Div.1962), *cert. denied* 37 N.J. 229, 181 A.2d 12 (1962). Accordingly if the default interest of $485,806.36 is added to the prepayment penalty of $402,804.47 "the resulting real 'Default Interest' is $888,610.83, which almost doubles the effective Default Rate being imposed by

Norwest to over 20%, clearly at a level 150 % over the contract rate of 7.88%, which is an unconscionable and, therefore unenforceable increase in the effective interest rate." (Defendants' Proposed Findings of Fact and Conclusions of Law ¶ 67).

Defendants' reliance on *Spiotta* is misplaced. In *Spiotta*, the Appellate Division held that where the mortgagee charged a premium or bonus of $13,000 for a $30,000 loan, the $13,000 was a definite sum paid in addition to interest in advance, so that the interest rate of 38.76% after default as compared to the 30.18% before default was unconscionable and unenforceable.

> Significantly the Court noted that
> *[t]his sum did not represent a charge for some service provided by plaintiff, or finance charges.* Stripping away the label of premium or bonus, the $13,000 can only be considered a sum exacted from the company for the use of plaintiff's money, i.e. interest.

*Spiotta*, 72 N.J.Super. at 578, 179 A.2d 49 (emphasis added and citations omitted).

Should a prepayment penalty be considered interest or is it, in the language of *Spiotta*, a sum representing "a charge for some service provided by the plaintiff or finance charges?" *Spiotta*, 72 N.J.Super. at 578, 179 A.2d 49. Although no New Jersey case could be found that directly answers this question, other courts have found that a prepayment premium is not interest at all because it is not compensation for the use of money but a charge for the option or privilege of prepayment, and that such a prepayment premium is enforceable even when the lender accelerates the debt, so long as the loan documents clearly provide for the premium. *Parker Plaza West Partners v. UNUM Pension and Ins.*, 941 F.2d 349 (5th Cir.1991)(applying Texas law); *Resolution Trust Corp. v. Minassian*, 777 F.Supp. 385 (D.N.J.1991)(applying New Jersey law).

In other words, it is, in the language of *Spiotta*, a sum representing a benefit that the borrower otherwise would not be entitled to.

In *In re Schaumburg Hotel Owner Ltd. P'ship*, the Bankruptcy Court held that a default rate of interest of nineteen percent as well as a ten percent prepayment premium were enforceable. 97 B.R. 943 (Bkrtcy.N.D.Ill.1989). The rationale for enforcing prepayment premiums rests on the recognition that such premiums serve as compensation to the lender for the losses incurred by the lender when it receives prepayment of its loan earlier than originally planned. *See United States v. Harris*, 246 F.3d 566, 572–73 (6th Cir.2001); *Parker Plaza West Partners v. UNUM Pension & Ins.*, 941 F.2d 349, 355 (5th Cir.1991); *In re Financial Center Associates of East Meadow*, 140 B.R. 829, 835–837; *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir.1984).

The defendants argue that because the default interest rate and the prepayment premium penalty both seek to compensate Norwest for the same loss; namely, lost opportunity and market conditions requiring the Lender to lend at lower rates, the two should be considered as one liquidated damages provision in evaluating their reasonableness. Darryl Black testified that the purpose of the prepayment consideration was "to compensate the lender because he might get his money back sooner than he anticipated, and the interest rate market might be lower on the day he has to put the money back out, and to make him whole he calculates an amount that is intended to make him whole." (Black Test. 8/1/02 Tr. at 54:3–10.) With that testimony Defendants then turn to the language from MetLife that the "three percent increase [in the default interest] in this case is a reasonable estimate of the potential costs of administering a defaulted

loan, and the potential difference between the contract interest rate and the rate that MetLife might pay to secure a commercial loan replacing the lost funds." *MetLife*, 159 N.J. at 502, 732 A.2d 493.

■ The Court does not read *MetLife* to require the conclusion that prepayment premiums are duplicative of default interest. First of all, *MetLife* was not faced with the enforceability of a prepayment premium and so did not address the issue. Secondly, the Supreme Court recognized that default interest covers not just lost opportunity costs but a "reasonable estimate of the potential costs of administering a defaulted loan," and "additional sums required in the context of collection activity, such as travel costs, expert fees and the costs of its loan officers' involvement in collection activities [which] are difficult to prove with respect to any specific loan at its outset." *Id.* at 503, 732 A.2d 493. Finally, a prepayment premium is not a charge for the use of the money but consideration for something that unless bargained for a borrower is not entitled to; namely, the right to prepay.

■ Under New Jersey law unless the note gives the borrower the right to prepay the loan, the borrower is obliged to pay the full amount of the interest that he would have to pay over the term of the loan. *Eliasz v. Broadway Bank and Trust Co.*, 33 N.J. 470, 471, 166 A.2d 166 (1960). Since a lender has the right not to have the loan prepaid but rely on collecting the interest contracted for, the lender is entitled to charge a penalty to the borrower for the privilege of prepayment. *Bloomfield Savings Bank v. Howard S. Stainton and Co.*, 60 N.J.Super. 524, 532, 159 A.2d 443, 447 (App.Div.1960); *see also Resolution Trust Corp. v. Minassian*, 777 F.Supp. 385, 390 (D.N.J.1991) (observing in light of these cases that "the prepayment penalty may more properly be seen

not as additional interest, but as consideration paid by the borrower to cancel the loan and cut short the lender's right to interest agreed on").

The loan documents here clearly provide that upon default the lender could both accelerate the debt and collect the prepayment fee. Paragraph 5(c) of the Note provides:

> For purposes of this Note, the term default Repayment: shall mean a repayment of the principal amount of this Note made during the continuance of any Event of Default or after an acceleration of the Maturity Date under any circumstances, including, without limitation, a repayment occurring in connection with reinstatement of the Security Instrument provided by statute under foreclosure proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, ANY SALE IN FORECLOSURE, or under exercise of a power of sale or otherwise.

What was said about default interest applies equally as well here. The burden of proof to show that this clause constitutes an unenforceable penalty rests on the defendants; they produced no evidence that they lacked an opportunity to bargain over this clause. Considering the financial sophistication and experience of Mr. Berger, the general partner of Blair Road, it is significant that there was no evidence that the prepayment premium was anything other than a common practice in a competitive industry or outside commercially accepted rates.

Nor have the defendants proved that the amount of the default interest and prepayment premium together are unconscionable and therefore unenforceable. If the defendants had made all of the required

payments over the life of the loan through maturity (May 1, 2004), they would have paid Norwest a total of $5,989,695.55 in principal and interest. However, Norwest is seeking a judgment totaling $5,235,-907.08—an amount that is approximately $760,000 less than the amount the defendants in the loan documents agreed to pay. (Black Supp. Aff. 5/20/02 at ¶ 6; *see In re Schaumburg*, 97 B.R. at 943.) Under the facts of this case, enforcement of the parties' agreement as to the prepayment premium does not effect an unlawful windfall to Norwest.

Applicable to this complex commercial loan and the sophisticated parties is the language of the Supreme Court in *MetLife* (mutatis mutandis):

> Because default and late charges are not liquidated damages at all in the traditional sense, but are simply part of the pricing of commercial loans between sophisticated parties, MetLife asserts that in the absence of unconscionability or illegality, those charges should be enforced. We agree in today's competitive market that ordinarily such charges are part of the cost of doing business. We, however, prefer to incorporate that factor into the "reasonableness" test. Courts are accustomed to dealing with the standard of reasonableness. We think that standard rather than an "unconscionability" standard provides an adequate safeguard for the lenders and better protection for the borrowers.

159 N.J. at 504–05, 732 A.2d 493. Because default interest and the prepayment consideration reflect different economic realities and are part of today's commercial environment, they pass the reasonableness test of *MetLife*.

(3) *The Prepayment Premium Is Not Due Until Sale of the Property at a Foreclosure Sale*

 Relying on the literal language of paragraph 5(c) of the Note,[11] Defendants argue that the amount to be repaid by the borrower is only due here after a judgment of foreclosure has been entered, a writ of execution has been issued and a judicial public sale has been conducted. (Defendants' Proposed Findings of Fact and Conclusions of Law # 18.) Defendants argue that since the issuance of a judgment of foreclosure is not a payment of money, there has not been a "repayment" and therefore Norwest is not entitled to a judgment that includes the prepayment premium at this time (*Id.* at # 21,22), but must wait until the date of sale in foreclosure (*Id.* # 24) to calculate the prepayment consideration on the funds generated by the sale. In the same breath defendants offer an alternative in proposed finding # 26:

> The judgment, if it is to include the default prepayment consideration, must include a provision, in lieu of a specific dollar amount at this time, which orders the calculation of the default prepayment consideration in accordance with the formula set forth in the Note as of the date of redemption or scheduled date of foreclosure, whichever occurs first, and further orders the amounts calculated to be then added to the amount of the judgment.

 The defendants have not supported this argument with any case law. It is not surprising that they have not because it would frustrate the prevailing law regarding the effect and purpose of a foreclosure judgment. The express purpose of a judgment of foreclosure is to fix the

---

11. "[T]he term Default Repayment: shall mean a repayment of the principal ... under any under any circumstances, including, without limitation, a repayment occurring in connection with ... any sale in foreclosure...." (Note, ¶ 5(c).)

amount due under the mortgage and direct the sale of the real estate to raise funds to satisfy the amount due. *Eisen v. Kostakos,* 116 N.J.Super. 358, 365, 282 A.2d 421, 424 (App.Div.1971)(final foreclosure judgment fixes the amount due under the mortgage and directs the sale of the real estate to raise funds to satisfy the amount due); *see also Matter of Roach,* 824 F.2d 1370, 1378 (3rd Cir.1987). The construction urged by the defendants would defeat the purpose of the judgment: to "declare a sum certain immediately due and [to] commit the proceeds of the sale of specific property to its satisfaction." *Id.* at 1378.

It is true that the language of the Note does not address specifically the calculation of the prepayment when the property is sold at a foreclosure sale. The parties did not spell out how to calculate the prepayment penalty in the event of a foreclosure sale. But the approach suggested by the defendants would frustrate the intention of the parties expressed in the Note that the plaintiffs do receive a prepayment premium: "a repayment of the principal ... after an acceleration of the Maturity Date under any circumstances, including, without limitation a repayment occurring in connection with ... any sale in foreclosure ..." (Promissory Note ¶ 5(c).)

■ It is axiomatic that "an agreement must be construed in the context of all the circumstances under which it was entered into and must be accorded a rational meaning in keeping with the express general purpose." *Tessmar v. Grosner,* 23 N.J. 193, 201, 128 A.2d 467, 471 (1957). "Effect, if possible, will be given to all parts of the instrument and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." *Goldberg v. Commercial Union Ins. Co. N.Y.,* 78 N.J.Super. 183, 190, 188 A.2d 188, 191 (App.Div.1963);

modified on other grounds, *Harr v. Allstate Ins. Co.,* 54 N.J. 287, 255 A.2d 208 (1969).

■ If the defendants' construction were adopted there would be no mechanism post foreclosure judgment to compute the amount of the prepayment consideration and to have it satisfied from the proceeds of sale. Once a successful bidder purchases the property for a sum certain, based upon the judgment amount or a broker markets the property to a purchaser, the plaintiff would be unable at that point to recover the prepayment amount because it would not have been included in the foreclosure judgment. When a foreclosure judgment is entered, the mortgage is merged into the final judgment and the mortgage is extinguished. *Matter of Kennedy,* 158 B.R. 589, 593 (Bkrtcy.D.N.J. 1993). The Court could not conduct some kind of post foreclosure sale hearing to calculate the amount of the prepayment consideration because a foreclosure judgment is res judicata as to the amount of the unpaid debt secured by the mortgage. *79–83 Thirteenth Avenue Lts. v. DeMarco,* 79 N.J.Super. 47, 55, 190 A.2d 391, 395 (N.J.Super. Law Div.1963) *aff'd* 83 N.J.Super. 497, 200 A.2d 506 (App.Div.1964), *aff'd* 44 N.J. 525, 210 A.2d 401 (1965).

The alternative argument that the calculation has to be postponed until the actual date of the foreclosure is not required by the Note or New Jersey law and makes no sense. Such an approach would undercut the ability of Norwest to notify prospective bidders in advance of the foreclosure sale as to the exact amount due under the judgment. The defendants are not being prejudiced by fixing the amount of the prepayment now because the Default Repayment is calculated on either 3% of the principal amount of the Note or pursuant to a formula—whichever is greater. (Note at ¶ (c), p. 4.)

The construction of the Note to provide for calculation of the prepayment premium at the time of the execution judgment carries out the intention of the parties that the amount due to the lender be satisfied from the proceeds of the sale, does not violate New Jersey law, and is commercially reasonable. (Black Test. 6/6/02 Tr. at. 102–104; *see* Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L.Rev. 833 (1964).)

### (4) *Post Judgment Interest*

Norwest seeks post judgment interest pursuant to 28 U.S.C. § 1961 not the contract rate from the date of entry of the foreclosure judgment. (*See* Norwest Proposed Findings of Fact at # 77.) Since Defendants, naturally enough, agree, the Court will order it. (*See* Defendants' Proposed Findings of Fact and Conclusions of Law # 78.)

### (5) *Late Charges should Only Be Calculated to Date of Acceleration*

Norwest originally sought late charges in the amount of $17,256.15, calculated from date of default through the filing of the complaint on February 6, 2000. (*See* Black Aff. 5/20/02 at ¶ 7.) Defendants contend that the late charges should only be calculated through the date of acceleration on December 23, 1999. Although disagreeing with the defendant's position, Norwest is willing to accept an award of late charges through the date of loan acceleration on December 23, 1999 and not pursue late charges for January 2000 and February 2000. The Court, therefore, finds the late charges to be $12,774.01. (*See* Black Aff. 5/20/02 Ex. 1) [Account Status Summary]; Norwest Proposed Findings of Fact and Conclusions of Law at # 20–21.

### (6) *Interest Should be Paid on Improperly Held Rent*

■ Defendant contends that the amount of the judgment being sought by Norwest should be reduced by $4,088.94 representing interest on rent received by Norwest from the Rent Receiver. (*See* Defendants' Proposed Findings of Fact and Conclusions of Law at # 85–93.) The Court agrees. When a mortgagee collects rents it must either apply them to the outstanding obligation or credit interest to the debtor. *MetLife*, 159 N.J. at 502–503, 732 A.2d 493. Defendants are entitled to a credit for the interest that the withheld rent would have accrued in the amount of $4,088.94. (*See* Mont. Test. 8/1/02 Tr. at 16:12–23.)

### (7) *Norwest Breached Its Covenant of Good Faith and Fair Dealing*

■ Defendants argue that Norwest breached its covenant of good faith and fair dealing implied in the loan transaction by its "bad faith conduct in the conduct of this litigation and/or its attempt to manipulate the judicial process and perpetrate a fraud on this Court in its knowing overstatement of the sums due under the loan...." (Defendants' Proposed Findings of Fact and Conclusions of Law at # 139); *see MetLife*, 159 N.J. at 502, 732 A.2d 493 (recognizing implied covenant of good faith). Accordingly the Court should disallow the legal fees being requested and the amount of the prepayment penalty and award the defendants punitive damages. The Court concludes that this objection is entirely without merit.

Defendants argue first that the Note does not authorize Norwest to pay its legal fees from the rent proceeds without judicial approval relying on paragraph 17 of the Note. This argument, however, is not supported by the language of the Note, which reads:

In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security therefor, Borrower also agrees to pay all reasonable fees and expenses of Lender, including without limitation, reasonable attorney's fees for the services of such counsel whether or not suit be brought.

Defendants' argument is further undermined by the language of ¶ 10.2 of the Mortgage:

10.2 *Application of Proceeds.* The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Defendants contend that Norwest acted in bad faith in requesting attorneys fees when it had actually over the course of time deducted $115,000.00 in legal fees from the rents, so that no legal fees were actually due. (Black Test. 8/1/02 Tr. at 18–31.) Defendants argue that Norwest deliberately attempted to deceive the court by requesting an award of legal fees in the Judgment when it had not only been paid but overpaid.

It is true that Norwest paid $115,000.00 to its attorneys from the rents collected by the Rent Receiver from the Property. (Black Test. 8/1/02 Tr. at 20:1–21:8.) Norwest acknowledges that this exceeds what it is entitled to by the New Jersey Rules of Court and concedes that defendants are entitled to a credit for any excess fee paid. (*See* Norwest's Proposed Findings of Fact and Conclusions of Law # 28.)

It is also true that the payment of the legal fees is not readily discernible from Norwest's records, for it appears under what is designated as the PMI account, which was not identified until the evidentiary hearing. (Black Test. 8/1/02 Tr. 17:1–20:21.) Were it not for the Defendants' persistence, the Court would never have known that the PMI Account reflected payment of unapproved counsel fees.

As further evidence of Norwest's bad faith, defendants point to the fact that Norwest was seeking a judgment amount which included sums for the appraisal, environmental reports, and other miscellaneous expenses that in fact had already been paid. (Black Test. 8/1/02 Tr. at 108:19–109:2.)

While not condoning the actions of Norwest, the Court accepts as credible the testimony of Darryl J. Black that he was "not trying to defraud the borrower out of money." (Black Test. 8/1/02 Tr. at 38:7–18.) According to Black he accepted the accounting information which included the $115,000 and then asked counsel for the amount of the legal fees allowed by law and added that to the amount of the proposed judgment without comparing the two figures. (*Id.* at 39:10–17.) Black explained that legal fees were allocated and paid and that Norwest "would either get reimbursed to the extent that the law allows, or if the law doesn't allow it, then we would return the portion that's not allowed." (Black Test. 8/1/02 Tr. at 18:17–21.) Nor does the Court find that plaintiff's counsel has acted in any way other than professionally. Mistakes happen. The Court concludes that Norwest's seeking legal fees in addition to what it had been paid from the rental income was a mistake that can be corrected and does not justify the draconian penalty that defendants ask this court to impose. The same holds true for the miscellaneous expenses.

As to Defendants' argument that "plaintiff in this action has repeatedly acted in bad faith in the conduct of this litigation by consciously and purposely avoiding and stalling legitimate attempts of the borrower to conduct discovery," (Defendants' Proposed Findings of Fact and Conclusions of Law # 123), the Court notes that just as one swallow does not make a summer, neither does one discovery dispute constitute bad faith.

Norwest acknowledged holding in a "Reserve Account" the sum of $169,580.05 [12] (originally calculated at $168,996.74.) (Black Test. 8/1/02 at 69:13–15.) The Reserves represents an amount taken out of the rental income "for things such as tenant improvements, leasing, commissions, repairs" *Id.* at 69:17–25; June 6, 2002 Tr. at 83–85. There was nothing surreptitious about this. It was reported in prior affidavits of Black. See for example Black's May 20, 2002 Affidavit Exhibit 1 (second to last page)(calculated to be $169,580.05). According to Black the Judgment could be calculated on the amount due without crediting the borrower with the amount in the Reserves and would be refunded at a later date. (Black Tr. 8/1/02 at 70:1–25.) In any event Norwest acknowledges that the Defendants are entitled to a credit of 169,-580.05 "assuming such funds are not required for the stated purposes of its establishment per Mr. Blacks's" testimony. (Plaintiff's Proposed Findings of Fact and Conclusions of Law at # 28.)

Defendants state that they are also entitled to a deduction against the amount due the sum of $24,502.96 [13], which is being held in the current suspense escrow balance as set forth in Black's August 16 Affidavit at Par. 10. (Defendants' Pro-

posed Findings of Fact and Conclusions of Law # s 125 & 126.) Norwest agrees. (Plaintiff's Proposed Findings of Fact and Conclusions of Law # 28(c).)

The Court has reviewed the Affidavits, Briefs and evaluated all of the testimony. While mistakes were made in calculating the amount due, the Court does not find that there was any attempt deliberately to mislead the defendants or the Court. The Court concludes as a matter of law that Norwest has not breached its covenant of good faith and fair dealing.

### (8) *Norwest is Not Entitled to Legal Fees*

Norwest seeks legal fees in the amount of $52,806.00. (Black Aff. 8/16/02 at ¶ 8) Defendants object on the ground that no fees should be paid because Norwest breached its covenant of good faith and fair dealing and that the fees are excessive. (Defendants' Brief at 7.) There is no merit to this objection. The Court has previously concluded that Norwest did not breach its covenant of good faith and fair dealing, so fees cannot be denied to its counsel on that basis. Nor are the fees excessive. The declarations of William T. Marshall (executed January 3, 2002 and August 7, 2002) detail with considerable specificity the legal services rendered and costs incurred.

The Court permitted defendants to depose Norwest's counsel William T. Marshall, Esq. and Philip S. Rosen, Esq. Despite that, the defendants' proposed findings of fact do not identify the type of work challenged nor specify the hours claimed to be unreasonable or excessive. The objection in the defendants' brief at page 7 to the charges of $15,000 in the

---

**12.** By the time of this opinion the amount in the Reserve Account had risen to $170,133.29.

**13.** By the time of this Opinion the amount in the Suspense Escrow Account was $25,631.66.

first month, $30,000 in the second month and $45,000 in the third month is insufficient. *See Bell v. United Princeton Properties*, 884 F.2d 713 (3d Cir.1989). The Court finds the fees to be reasonable. This was a vigorously contested foreclosure action which included court appearances, evidentiary hearings, depositions, and telephonic conferences, as well as substantial research and numerous submissions all fully substantiated by affidavit. (*See* Marshall Aff. 8/7/02.)

### E. *Joint and Several Liability of Defendants*

Under Paragraph 14(b) of the Note (p.7) the Borrower Blair Road is personally liable for misapplication or misappropriation of rents received·*after* the occurrence of an event of default and non-payment of real estate taxes. Norwest seeks $194,066.22. (Black Aff. 1/2/02 ¶ 3(a-f).) Under Subsection (a) of the section of the Guaranty styled "Guaranteed Recourse Obligations of Borrower" (p.1), USLR guaranteed this amount. *Id.* Therefore of the total amount of the foreclosure judgment, Norwest seeks to hold Defendants personally liable (jointly and severally) in the amount of $194,066.22. (Par. 14 of Black Aff. 5/20/02 ¶ 14; Black Test. 6/6/02 Tr. at 111–113; Tr. 8/1/02 at 71–73.)

Included in the $194,066.22, however, are rents for the month of December, 1999 in the amount of $57,693.75. (Mont–Direct Tr. at 27:7–16; Black 1/2/02 Aff. ¶ 3.) These rents were paid by December 8, 1999 (Mont. Direct, 8/1/02 Tr. at 27:7–10) *before* default was declared by Norwest on December 23, 1999. (Black–Cross 8/1/02 Tr. at 73:9–11.) Therefore under the terms of the Note the rents of $57,693.75 cannot be part of the recourse obligation of the defendants and the sum of $194,066.22 must be reduced by that amount. Agreeing with the Defendants's position on this issue (Mont Direct 8/1/02 Tr. at 27:14–19), the Court concludes that Blair Road and USLR are jointly and severally liable in the amount of $137,373.42.

### F. *Calculation of Amount Due Plaintiff*

(a) The Plaintiff Wells Fargo is entitled to the following:

| Sums | Amounts Due |
|---|---|
| Principal Balance: | $4,206,151.10 |
| Accrued Interest from October 1, 2002 to January 1, 2003: | $ 85,623.22 |
| Prepayment Consideration: | $ 337,871.37 |
| Default Interest: | $ 528,637.22 |
| Late Charges: | $ 12,774.01 |
| Total: (to nearest $1.00) | $5,171,057.00 |

(b) Less the following Credits to Blair Road:

| | |
|---|---|
| Suspense Escrow Account: | $ 25,631.66 |
| Legal Fees: | $ 96,232.72 |
| Reserve Account Credit: | $ 170,133.29 |
| Interest on Rent in Suspense Account: | $ 4,088.94 |
| Interest on Missing Check: | $ 3,264.00 |
| Total: (to nearest $1.00) | $ 299,351.00 |

(c) Counsel Fees:

| | |
|---|---|
| Total: (to nearest $1.00)<br>[ ($5,171,057 − $299,351 = $4,871,706 − $10,000)* 1% = 48,617.06 + $75 + $175] = | $ 48,867.00 |
| Total Amount Due Plaintiff: [a − b + c] = | $4,920,573.00 |

G. *Miscellaneous*

The defendants request that for purposes of determining the amount of the judgment that any rents provided by the Rent Receiver subsequent to the evidentiary hearing be credited against the proposed judgment now and that the counsel fees be reduced accordingly. The Court denies this request. This foreclosure action has dragged on for too long.

Some of the delay has been due to Norwest's opaque accounting terminology, but a good deal of the delay has also been due to Defendant's failure to follow the Court's scheduling orders to resolve the issues without the necessity of an evidentiary hearing. The parties are entitled to their day in court, but the Plaintiff is entitled to a Judgment of Foreclosure now.

Any rents from the Rent Receiver to the Plaintiff since the last accounting can legitimately be held by the Plaintiff in the reserve account until the foreclosure sale, at which time they can be credited against the amount due on the Judgment. Mr. Black testified that Plaintiff requires funds to be deposited in reserves so that there are sufficient funds to pay for improvements or repairs. (Black Test. 6/6/02 Tr. at 84–85.) This reserve will be particularly important because there will undoubtedly be an appeal further delaying a foreclosure sale and justifying a Reserve Account for emergencies.

The Plaintiff should prepare a Certification of Amount Due in Support of Issuance of Execution for Reduced Amount. (*See* Weinstein, 30B N.J. Practice § 143 P. 467–68 (2000).) Any objections to the Certification of Amount Due by Defendants should be filed with the Court and served on Plaintiff's counsel within five days of receipt of the Certification.