727 A.2d 93 (1999)
320 N.J. Super. 325
STATE of New Jersey, Plaintiff-Respondent,
v.
John CRYAN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 30, 1999.
Decided April 16, 1999.
*94 Litvak, Accardi & Trifiolis, for defendant-appellant (Anthony J. Accardi, Livingston, of counsel and Jonathan H. Tepper, Newark, on the brief).
John B. Dangler, Morris County Prosecutor, for plaintiff-respondent (Joseph Connor, Jr., Assistant Prosecutor, on the brief).
Before Judges KEEFE, EICHEN, and COBURN.
The opinion of the court was delivered by COBURN, J.A.D.
Acting under orders to stop every motor vehicle observed moving in the borough, a police officer, after noting that defendant did not react for about five seconds when a red light at which he was stopped turned green, followed the vehicle a short distance and then stopped it by activating his emergency lights. The stop led to a charge of driving while intoxicated (DWI). The primary issue presented by this appeal is whether the police officer's action can be sustained as part of the community caretaking function based on his testimony that he stopped the vehicle for two reasonsthe orders and his concern "for why the vehicle was stopped for such a period of time at the green light."
Defendant pled guilty in municipal court to DWI, N.J.S.A. 39:4-50.1, preserving his right to test on appeal the validity of the officer's stop of the vehicle. The Law Division, in a de novo trial on the record below of the suppression hearing, agreed with the municipal court and independently determined that the stop was valid community caretaking. We disagree and reverse.
I.
The facts are not in dispute. At approximately 4:24 a.m., on September 5, 1997, a uniformed police officer was traveling eastbound on Columbia Turnpike in a marked police car. At the intersection with James Street, the officer pulled up behind defendant's vehicle, a Toyota Land Cruiser, which was stopped in the left-hand turning lane for the red light. Because the rear windows were tinted, all he could see were the silhouetted figures of two people in the Toyota. Using his mobil data terminal,[1] the officer determined that there was nothing out of the ordinary with respect to the vehicle. When the light turned green, the defendant's vehicle remained stationary for approximately five seconds and then "proceeded to make the left-hand turn very slowly." The officer followed for about 100 feet, then activated his emergency lights and stopped defendant in a parking lot near the corner. There were no other vehicles on the road at this early-morning hour.
The officer explained that there had been an unusually large number of burglaries in the area, and the police force was "running an extra patrol" looking for burglars. The patrol officers were instructed to be particularly observant for vehicles containing more than one person, and they were also told that "there were stolen vehicles possibly being used...." He further explained the general orders in this manner:
[T]he orders I got from our detective lieutenant were we were to check outstop any vehicle that basically moved within ... the Borough and we did accordingly. We stopped ... approximately 50 to 100 cars.... [It] ... is not normal for us to stop every car. It was a special detail designed by the Detective Bureau and that also filtered down onto the ... road guys.
The officer was asked, "So any vehicle you saw from midnight until the end of your detail at 7:00 [a.m.] you pulled over?" The officer answered, "Yes."
When he was asked why he had stopped defendant's vehicle, the officer conceded that there was no indication that this vehicle had been involved in a burglary and said:
My purpose in signaling the stop was... for two reasons. I was concerned for why the vehicle was stopped for such a *95 period of time at the green light, and I was also inquisitive about the vehicle in relation to the burglaries. We were stopping every car. So I was just performing my duty as far as I was told by our detective lieutenant.
The officer also explained his action by noting that when the vehicle did not move after the light changed, "I was suspicious as toI wanted to get some information about the vehicle."
II.
The State contends that this motor vehicle stop may be sustained under the community caretaking function. Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706, 714-15 (1973). The Law Division judge, although noting that the case presented a "very close call," accepted that theory. An appellate court is required to give considerable deference to a judge's factfinding, see, e.g., State v. Locurto, 157 N.J. 463, 470-72, 724 A.2d 234 (1999), but we are not obliged to give deference to the judge's legal conclusions, State v. Brown, 118 N.J. 595, 604, 573 A.2d 886 (1990); Manalapan Realty v. Township Committee, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.") In this case, as we have noted, the facts are undisputed, and we accept the judge's findings in that regard. However, we differ with respect to the legal consequences that flow from those facts.
We first addressed the community caretaking theory in State v. Goetaski, 209 N.J.Super. 362, 507 A.2d 751 (App.Div.), certif. denied, 104 N.J. 458, 517 A.2d 443 (1986). In that case, the officer observed the defendant at about 4 a.m. driving slowly on the shoulder of a rural state highway. Id. at 363, 507 A.2d 751. The speed limit was fifty miles per hour. Ibid. The defendant's left-turn signal was blinking. Ibid. The officer stopped the vehicle after watching it proceed in that manner for a tenth of a mile. Ibid. When the officer approached the car and talked with the driver, he made observations that led to a DWI charge. Ibid. We defined the issue as whether those circumstances provided a "sufficient reason for the officer to stop defendant and inquire generally if there was any problem or difficulty." Id. at 364, 507 A.2d 751 (emphasis added). We sustained the stop, even though no motor vehicle law had been violated, because "the facts were unusual enough for the time and place to warrant the closer scrutiny of a momentary investigative stop and inquiry." Id. at 366, 507 A.2d 751. But we also said, "we do not hesitate to add that this stop is about as close to the constitutional line as we can condone." Ibid.
We returned to the community caretaking issue in State v. Martinez, 260 N.J.Super. 75, 615 A.2d 279 (App.Div.1992), also a DWI case. A state trooper observed Martinez driving, at 2 a.m., less than ten miles per hour in a residential twenty-five mile per hour zone. Id. at 77, 615 A.2d 279. He described the vehicle as proceeding "at a snail's pace," which he considered abnormally slow. Ibid. After following for a time not set out in the opinion, the officer stopped Martinez and made the observations leading to the DWI charge. Ibid. We sustained the stop and made these comments:
We take notice, however, that operation of a motor vehicle in the middle of the night on a residential street at a snail's pace between five and ten m.p.h. is indeed "abnormal," as the Trooper testified. Such abnormal conduct suggests a number of objectively reasonable concerns: (a) something might be wrong with the car; (b) something might be wrong with its driver; (c) a traffic safety hazard is presented to drivers approaching from the rear when an abnormally slow moving vehicle is operated at night on a roadway without flashers; (d) there is some risk that the residential neighborhood is being "cased" for targets of opportunity. Possibilities (a), (b) and (c) involve the "community caretaking function" expected of alert police officers. See, Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973); Goetaski, supra, 209 N.J.Super. at 365, 507 A.2d 751; State v. Marcello, [157 Vt. 657] 599 A.2d 357, 358 (Vt.1991); State v. Pinkham, 565 A.2d 318, *96 319 (Me.1989). Possibility (d) implicates the "common-law right to inquire" based upon a founded suspicion that criminal activity might be afoot. See LaFave, Search and Seizure, Sec. 9.2(h) (2d ed.1987). It is appropriate to consider all of these applicable concerns and balance them against the minimal intrusion involved in a simple inquiry stop. We are satisfied on this balance that the stop was objectively reasonable and fell far short of the line of unconstitutionality we drew in Goetaski.
[Id. at 78, 615 A.2d 279.]
Finally, in State v. Washington, 296 N.J.Super. 569, 687 A.2d 343 (App.Div.1997), we sustained a stop in another DWI case where the defendant had been observed at 12:20 a.m. traveling thirty-six miles per hour in a forty-five mile per hour business zone, weaving within his lane. Id. at 571, 687 A.2d 343. We had this to say:
Police officers have a community caretaking function. That function has its source in the ubiquity of the automobile and the dynamic, differential situations police officers are confronted with to promote driver safety. See United State [States] v. Rodriguez-Morales, 929 F.2d 780, 784-86 (1st Cir.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). It finds support in the premise that abnormal operation of a motor vehicle establishes a reasonably objective basis to justify a motor vehicle stop. See State v. Martinez, 260 N.J.Super. 75, 78, 615 A.2d 279 (App. Div.1992). What is reasonably objective is measured by the dynamics or totality of the circumstances from the perspective of the officer on duty at the time and not from the esoteric perspective of the courtroom. See United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). Applying the former perspective, we are satisfied the officer had a reasonably objective basis to stop defendant's automobile.
Fundamental logic dictates that an officer has a reasonably objective basis to stop a motor vehicle weaving down a roadway in the manner here. This is true whether or not the driver stays in his or her lane of travel. Even while maintaining one's lane of travel, a driver that weaves a car down a highway, as defendant did, engenders reasonable grounds to conclude that the vehicle is a potential safety hazard to other vehicles and that there is either something wrong with the driver, with the car, or both. See Martinez, supra, 260 N.J.Super. at 78, 615 A.2d 279. If on-duty police officers are to fulfill their responsibility to promote safety for the traveling public, intervention is mandated in such circumstances.
That defendant stayed in his lane of travel did not extinguish a community caretaking function. Driving in a manner that could lead to crossing the center line at an inopportune time, a time when another oncoming vehicle is about to pass, is a controlling consideration. Moreover, when the weaving is combined with the unconventionally slow speed, there is more than a reasonably objective basis to conclude defendant's ability to drive was impaired, justifying the stop.
In sum, we conclude the manner of defendant's driving on the night in question provided the officer with a reasonably objective basis for stopping the car. Consequently, the order under appeal was improvidently entered.
[Id. at 572-73, 687 A.2d 343.]
In each of the above cited cases the stop was justified on a community caretaking basis because the abnormal operation of the vehicle indicated that the driver might be in some difficulty, thereby presenting a hazard to himself or others. Inferences of that sort cannot be reasonably drawn from a driver's failure to proceed for five seconds after a red light has turned green when the only other vehicle in the area is a marked police car stopped immediately to the driver's rear. Therefore, a stop in these circumstances is not objectively reasonable; it is unconstitutional. See, e.g., Doheny v. Commissioner of Public Safety, 368 N.W.2d 1, 2 (Minn.Ct.App.1985) (holding the officer's belief that the motorist was lost did not justify the stop); North Dakota v. Brown, 509 N.W.2d 69, 71-72 (N.D.1993) (holding a stop invalid because the officer failed to provide any clear reason for thinking the driver *97 needed assistance); Washington v. DeArman, 54 Wash.App. 621, 774 P.2d 1247, 1249-50 (1989) (holding despite the officer's belief that defendant or his motor vehicle was disabled because the vehicle remained motionless at a stop sign for forty-five to sixty seconds, this belief was dispelled when the vehicle moved, and therefore the stop was unjustifiable).
III.
The State contends, in the alternative, that the stop was justified because the officer had an articulable and reasonable suspicion that defendant was violating the law. More specifically, the State argues that in these circumstances there was reason to believe that the driver was intoxicated because of his delay in moving forward and the slowness of his turn; that he was driving carelessly, in violation of N.J.S.A. 39:4-97; and that his slow turning speed supported the inference that defendant was "casing the area for burglaries." Putting to one side the fact that none of these thoughts came to the officer, who testified that he stopped this vehicle because he was under orders to stop every moving vehicle during his shift, we reject the proposition that the facts objectively viewed would justify the inferences suggested by the State. See, e.g., Locurto, supra, 157 N.J. at 466, 724 A.2d 234 (vehicle speeding); State v. Smith, 306 N.J.Super. 370, 380, 703 A.2d 954 (App.Div. 1997) (vehicle weaving in and out of its lane); State v. Murphy, 238 N.J.Super. 546, 554, 570 A.2d 451 (App.Div.1990) (license plate improperly displayed). Furthermore, in deciding this case, the Law Division judge noted, without objection from the State, that he understood the State to be conceding that the officer did not have an articulable and reasonable suspicion that an offense had been committed. In fact, the prosecutor specifically limited her argument in support of the stop to the community caretaking theory and declined to argue any other justification.[2] Questions not raised below "will ordinarily not be considered on appeal." State v. Bobo, 222 N.J.Super. 30, 33, 535 A.2d 983 (App.Div. 1987).
The order denying defendant's motion to suppress is reversed. Since there is no evidence of guilt other than that gained from the illegal stop, defendant's conviction is reversed as well.
NOTES
[1] This device is described in detail in State v. Donis, 157 N.J. 44, 46-48, 723 A.2d 35 (1998).
[2] At no time has the State argued that the general order involved here, that officers on patrol were to stop all moving vehicles, passes muster under the Fourth Amendment. Certainly, our roadblock cases would suggest otherwise. See, e.g., State v. Kadelak, 280 N.J.Super. 349, 362-72, 655 A.2d 461 (App.Div.1995), certif. denied, 141 N.J. 98, 660 A.2d 1197 (1995); State v. Kirk, 202 N.J.Super. 28, 36-56, 493 A.2d 1271 (App.Div. 1985).