834 A.2d 475

MONY LIFE INSURANCE COMPANY, FORMERLY KNOWN AS MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, PLAINTIFF–RESPONDENT, v. PARAMUS PARKWAY BUILD-ING, LTD., A NEW JERSEY LIMITED PARTNERSHIP, DE-FENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 14, 2003—Decided November 13, 2003.

Before Judges NEWMAN, FALL and PARRILLO.

*Lawrence S. Berger* argued the cause for appellant (*Berger & Bornstein,* attorneys; *Ruth M. Meyer,* on the brief).

*Mark A. Slama* argued the cause for respondent (*Windels, Marx, Lane & Mittendorf,* attorneys; *Mr. Slama* and *Donna M. Alkin,* on the brief).

The opinion of the court was delivered by

PARRILLO, J.A.D.

In this commercial mortgage foreclosure action, defendant Paramus Parkway Building, Ltd. appeals from a final judgment of foreclosure on June 4, 2002 in favor of plaintiff, MONY Life Insurance Company, on the basis that there were material issues of fact concerning the amount due, necessitating a plenary hearing prior to entry of judgment. We disagree, and affirm.

The following factual and procedural history is relevant to our consideration of the issues advanced on appeal. On July 29, 1988, defendant borrowed $6.9 million from plaintiff, evidenced by a note and secured by a first mortgage lien on property known as

Lot 6, Block 4303 on the Tax Map of the Borough of Paramus, also known as 64 Midland Avenue, Paramus. Plaintiff operated the subject premises as a warehouse and office facility with 66,934 feet of office space and 28,866 square feet of warehouse space. As further security for the payment of that obligation, defendant simultaneously executed and delivered to plaintiff a security agreement covering the buildings, structures, improvements, fixtures, machinery and equipment (collateral) installed, constructed or attached on the subject property. Defendant also executed in favor of plaintiff an assignment of leases and rents, under which defendant assigned to plaintiff all rents and profits from the mortgaged premises as security for the faithful performance of the note obligation. Additionally, defendant executed a UCC–1 financing statement securing plaintiff's interest in the collateral. The mortgage, security agreement, UCC–1 financing statement, and assignment of leases and rents were recorded on August 2, 1998.

Following various defaults by defendant, a mortgage modification agreement and an allonge to the note were entered into between the parties on December 23, 1991, and recorded on January 10, 1992. Pursuant to the modification, the parties agreed that the maturity date for the payment of all outstanding principal and interest under the note would be October 31, 2001. The modification agreement acknowledged that, as of its date, the outstanding principal balance on the loan was $6,900,000, with unpaid interest due of $31,101.50, and late principal of $7,590.

The note obligation, as modified, required defendant to pay plaintiff monthly installments of principal and interest in the amount of $55,545, commencing November 1, 1991 and ending October 31, 2001, with all principal and interest to be paid on that date.

The note carried an interest rate of nine percent and a default interest rate of an additional six percent per annum. There was also a prepayment clause in the modification, which stated that:

[t]he Note may not be prepaid in whole or in part except as herein expressly provided. However, payment of the loan following a declaration of maturity based upon default in the payment of principal and/or interest, and/or based upon a default in the due observance or performance of any covenant, agreement or condition contained herein or in any document securing the Note, shall be deemed a prepayment, and any such payment to the extent permitted by law will therefore include a fee equal to the amount set forth herein. Borrower may prepay the loan in full but not in part, on any monthly installment date, upon (30) days' prior written notice to the Holder hereof, at a premium equal to the following:

. . . .

c. Commencing November 1, 1995, and thereafter, at three percent (3%) of the principal amount, declining one half of one percent per year.

Beginning in February 2001, defendant fell behind in its payments and, according to plaintiff, failed to turn over either pledged collateral or rents and failed to pay real estate taxes on the property. Consequently, on September 19, 2001, plaintiff served defendant with a notice of default and demand that rent monies be collected and turned over to apply to the indebtedness. Because none of the indebtedness was cured, plaintiff filed a foreclosure complaint in the Chancery Division on November 2, 2001, seeking judgment fixing the amounts due and owing to plaintiff, foreclosure of defendant's interest in the subject property, and various other relief.[1] On January 4, 2002, defendant filed an answer interposing various defenses including, among other things, that

---

[1] On December 5, 2001, plaintiff filed a motion for receivership, which was denied; however, due to later defaults of a prior order, a receiver was appointed by order of February 1, 2002. That order directed defendant to: (1) turn over to the receiver all of the funds in its accounts relating to the mortgaged premises, along with all of the financial records and bank statements; (2) pay the rent receiver all rents, issues and profits collected at the mortgaged premises prior to February 2002; (3) deliver the rent rolls and other documents relating to the mortgaged property to the rent receiver; and (4) turn over to the rent receiver all security deposits relating to the mortgaged premises. Pursuant to the February 1, 2002 order, the receiver was to manage the operations of the premises, and collect the rent to pay real estate taxes and operational expenses prior to turning the surplus over to plaintiff to satisfy the remaining mortgage.

On March 24, 2002, plaintiff filed a motion seeking to compel defendant's compliance with the February 1, 2002 order. On April 5, 2002, the court ordered defendant to immediately turn over to the rent receiver the sum of $25,887.50, and the additional sum of $23,600 within thirty days thereafter.

the note and mortgage were void due to illegal and unconscionable penalties contained therein.

On February 5, 2002, plaintiff filed a motion to strike defendant's answer, enter default, and permit the matter to proceed as an uncontested foreclosure action. No opposition was filed and the court, without objection, entered an order on February 22, 2002, striking defendant's answer, entering default and remanding the matter to the foreclosure unit of the Superior Court to proceed as an uncontested foreclosure action.

Thereafter, on May 14, 2002, plaintiff filed a motion, returnable May 31, 2002, seeking entry of final judgment in foreclosure, providing both the court and defendant with documentation and certification of the amount due and owing under the promissory note and modified mortgage agreement. Specifically, plaintiff sought a total amount of $6,549,879.70, which included $5,476,106.84 in principal; $644,813.13 in accrued interest at the contractual per annum rate of 9% accrued from January 1, 2001 through April 16, 2002; $401,579.20 in default interest at the note's additional 6% per annum rate from February 1, 2001 through April 16, 2002; and a prepayment premium at 1/2%, which totaled $27,380.53, that was provided for in the promissory note and mortgage.

On May 30, 2002, the day before plaintiff's motion was returnable, defendant filed an opposing brief together with counsel's certification consisting solely of a reference to an unpublished opinion of this court, *Lasalle Nat'l Bank v. Raritan Shopping Center, L.P.*, A–6064–97T1 (App. Div. June 24, 1999) (remanding for a full record to determine the enforceability of the default interest and prepayment clauses), and generally claiming, without any further factual or legal support, that certain provisions in the promissory note and mortgage were illegal and void as against public policy, and therefore warranted a plenary hearing.

On June 4, 2002, a final judgment of foreclosure was entered in the Chancery Division, finding that the amount due plaintiff as of April 16, 2002 was $6,549,879.90, together with costs of suit to be

taxed and a counsel fee in the amount of $7,500, and ordering that the property be sold to satisfy that sum. A writ of execution was also issued on that date, directing the sheriff to sell the property.

Although defendant appeals from this final judgment of foreclosure, he incorporates certain issues arising from post-judgment events and clearly outside the scope of the order under review. Nevertheless, for the sake of completeness, we digress briefly to recite these subsequent developments.

Before the sheriff's sale, defendant contracted to sell the property to a third party for over $2.5 million more than was owed under the mortgage. To effectuate the sale, defendant requested from plaintiff a "pay off" figure to satisfy all amounts then due and owing. By letter of June 10, 2002, plaintiff stated the pay off figure as of June 14, 2002 was $6,785,514.19 inclusive of $49,925.46 in legal fees, which was in excess of the $7,500 counsel fee awarded in the June 4, 2002 final judgment. Thereafter, in a further letter of June 14, 2002, plaintiff revised the pay off amount to $6,744,641.03 [2], which included, among other things, a $50,000 credit for proceeds from the rent receiver.

Although defendant disputed the pay off figure, he paid the $6,744,641.03 amount "under protest and without waiver of any of [its] rights and/or remedies." Considering defendant's payment to be an accord and satisfaction, and in return for which, plaintiff dismissed the action with prejudice, discharged the mortgage and assignment of leases of record, canceled the note and discharged the lis pendens allowing the property to be sold. The sale transaction was closed on June 18, 2002.

---

[2] The amount reflects a $50,000 credit of amounts paid to plaintiff by the receiver against the principal balance of $5,476,106.84 as of January 1, 2001; plus interest at the contract rate of 9% per annum from January 1, 2001 through June 14, 2002, totaling $725,585.90; default interest from February 1, 2001 through June 14, 2002, totaling $456,340; a prepayment premium of one-half of one percent, calculated to be $27,380.53; a release and satisfaction fee of $250; and, as noted, $49,925.46 in legal fees, costs and disbursements through May 30, 2002.

Thereafter, plaintiff once again revised the pay off figure downward to $6,701,095.27 as of the closing date, inclusive of additional "legal fees through June 19, 2002[ ]" of $6,380, plus *per diem* interest at the default rate from June 15, to June 19, 2002 amounting to $9,126.84. Consequently, defendant was informed that it was entitled to a refund in the amount of $93,545.46, which was being tendered by an enclosed check "with a complete reservation of [plaintiff's] rights and remedies and a waiver of none." Defendant, however, returned the tendered check, claiming that defendant had overpaid plaintiff "by substantially more than the said sum" and reserving "all of its rights and remedies under the law including, but not limited to, its right to seek damages from [plaintiff] for misappropriation of [defendant's] funds."

On July 18, 2002, a consent order was entered, terminating the rent receivership effective as of the date of the sale of the property on June 18, 2002; directing that all funds in the receivership account-save for $60,000-be paid to defendant, and that the $60,000 be held in order to pay the remaining outstanding expenses of the receivership, with the balance to be paid to defendant; and directing that the receiver prepare a final accounting. The final accounting was filed on August 15, 2002. No objection was ever lodged by defendant.

On appeal from the June 4, 2002 final judgment of foreclosure, defendant raises the following issues:

I. THE FORECLOSURE UNIT ERRED IN GRANTING PLAINTIFF'S MOTION FOR FINAL JUDGMENT BECAUSE DEFENDANT CONTESTED THE AMOUNT PLAINTIFF CLAIMED WAS DUE AND OWING.

II. THE TRIAL COURT ERRED IN GRANTING PLAINTIFF'S MOTION FOR FINAL JUDGMENT SINCE FACTUAL ISSUES EXISTED AS TO [PLAINTIFF'S] USE OF [DEFENDANT'S] MONEY.

III. THE TRIAL COURT ERRED IN ENTERING PLAINTIFF'S MOTION FOR FINAL JUDGMENT.

IV. THE FORECLOSURE UNIT ERRED IN GRANTING PLAINTIFF'S MOTION SINCE NECESSARY DISCOVERY HAD NOT BEEN COMPLETED AS TO THE ISSUE OF REASONABLENESS OF THE AMOUNTS CLAIMED TO BE DUE AND AS TO [PLAINTIFF'S] USE OF [DEFENDANT'S] MONEY.

V. THE FORECLOSURE UNIT'S DECISION SHOULD BE REVERSED SINCE IT FAILED TO RENDER FINDINGS OF FACT AND CONCLUSIONS OF LAW.

Specifically, defendant claims that (1) the principal indebtedness was miscalculated as it failed to include amounts paid to plaintiff by the rent receiver; (2) the 6% default interest rate was a penalty and unenforceable; (3) the prepayment premium was illegal; (4) the interest on the debt was miscalculated by calculating the *per diem* amount based on 360 days in the year rather than 365; and (5) the amount of attorneys fees demanded in the pay off letter far exceeded that ordered in the final judgment and was unreasonable. These allegations, in turn, serve as the basis for defendant's principal challenge on appeal that the court erred in not affording him an evidentiary hearing as to the amount of principal owed and the reasonableness of the fees incurred.

As a threshold matter, we summarily dispose of plaintiff's counter-argument that defendant's claims on appeal are moot simply because defendant satisfied the mortgage note in full. A case will be considered moot if the disputed issues were resolved. *Advance Elec. Co., Inc. v. Montgomery Township Bd. of Educ.*, 351 *N.J.Super.* 160, 166, 797 *A.*2d 216, 219 (App.Div.), *certif. denied*, 174 *N.J.* 364, 807 *A.*2d 195 (2002). Here, the mere fact that defendant paid off the mortgage does not extinguish its right to challenge the judgment. To be sure, the mortgage merges into the final judgment of foreclosure and the mortgage is extinguished; however, the judgment still remains. *Realty Asset Prop. Ltd. v. Oldham*, 356 *N.J.Super.* 16, 21, 811 *A.*2d 468, 471 (App.Div. 2002), *certif. denied*, 176 *N.J.* 71, 819 *A.*2d 1187 (2003). Since unresolved issues yet exist as to the final judgment, defendant's appeal is not moot. *See Advance Elec. Co., Inc., supra*, 351 *N.J.Super.* at 166–67, 797 *A.*2d at 219–20.

Nevertheless, we deem these remaining issues to be without merit. We reject outright defendant's first claim concerning the principal indebtedness since sufficient credible evidence in the record supports the amount determined to be due and owing;

defendant presented no contrary proofs below; all monies collected and disbursed by the rent receiver have been fully accounted for; and defendant's $93,545.46 overpayment has been acknowledged by plaintiff. Significantly, defendant's answer, with its affirmative defenses, was stricken and default entered on January 2, 2002. Moreover, in its opposition to plaintiff's motion for entry of final judgment, defendant never challenged the principal amount due, much less offered conflicting proof. Even after entry of judgment and the mortgage pay off, defendant never moved for a return of any contested amount or relief from judgment. *R.* 4:50–1. Nor did defendant ever object to the final accounting rendered by the receiver on August 15, 2002. Under the circumstances, there is no basis for interfering with the amount of the principal indebtedness determined to be due below.

Defendant's next claims concerning the reasonableness of the (a) accrued interest, (b) default interest, and (c) prepayment premium, all fail for the same reason. As to the accrued interest, defendant never raised below its claim, presented for the first time on appeal, that the *per diem* amount of interest was miscalculated based upon 360 days per year rather than 365 days. As such, the issue is not properly before us, *State v. Cryan*, 320 *N.J.Super.* 325, 332, 727 *A.*2d 93, 97 (App.Div.1999), and because it concerns neither a constitutional matter nor one of substantial public interest, we decline to consider it. *Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 230, 708 *A.*2d 401, 406–07 (1998); *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142, 145 (1973).

Defendant's other claims concerning the reasonableness of the default interest and prepayment premium charges suffer from the same fatal defect, namely they raise affirmative defenses that were struck in its answer and that were neither factually nor legally supported in defendant's opposition to plaintiff's motion for entry of final judgment. Consequently, these claims fail as well on appeal.

In New Jersey, liquidated damages, such as late fees, default interest rates, and prepayment premiums, are subject to the test of reasonableness, that is, whether the stipulated damage clause is reasonable under the totality of the circumstances. *Metlife v. Washington Avenue Associates, L.P.*, 159 *N.J.* 484, 493–95, 732 *A.*2d 493, 498–99 (1999); *Westmark Commercial Mortgage Fund IV v. Teenform Associates, L.P.*, 362 *N.J.Super.* 336, 341, 827 *A.*2d 1154, 1156 (App.Div.2003). *See also Norwest Bank Minnesota v. Blair Road Associates, L.P.*, 252 *F.Supp.*2d 86, 93–94 (D.N.J.2003) (evaluating default interest rate in a commercial contract using reasonableness standard). In *Metlife, supra,* a contested commercial foreclosure action, the Court validated a late fee of five percent of any delinquent payments as well as a default interest rate of 12.55%, which was three percentage points higher than the contract rate, holding that both charges were reasonable under the circumstances. The $1.5 million loan in *Metlife* involved an arms-length, fully negotiated transaction between two sophisticated commercial parties [3], each represented by counsel. Considered the negotiated cost of doing business, the Supreme Court recognized that:

> default charges are commonly accepted as a means for lenders to offset a portion of the damages occasioned by delinquent loans. As with the costs of late payments, the actual losses resulting from a commercial loan default are difficult to ascertain. The lender cannot predict the nature or duration of a possible default given many possible causes of borrower delinquencies. Nor is it possible when the loan is made to know what market conditions might be ten or fifteen years hence and, thus, what might be recovered from a sale of the collateral.
>
> [*Metlife*, 159 *N.J.* at 501–02, 732 *A.*2d at 503.]

The Supreme Court also recognized that default interest covers not just lost opportunity costs but a "reasonable estimate of the potential costs of administering a defaulted loan," and "additional

---

[3] We note that the general partner in Washington Avenue Associates, the defendant in *Metlife,* was Laurence S. Berger, who is also a principal of defendant in this case. Mr. Berger was also a principal in Blair Road Associates, the defendant in the *Norwest* case who was described by Judge Bassler as "a practicing attorney [who had] demonstrated a very high degree of sophistication in the area of mortgage lending." 252 *F.Supp.*2d at 94.

sums required in the context of collection activity, such as travel costs, expert fees and the costs of its loan officers' involvement in collection activities [which] are difficult to prove with respect to any specific loan at its outset." *Id.* at 502, 732 *A.*2d at 503.

In *Westmark, supra,* in addition to upholding as reasonable a six percent late fee and a ten percent default rate of interest, two percent above the contract rate, this court considered the question of a prepayment premium, as against a claim that it was duplicative of default interest and punitive, an issue with which the *Metlife* court was not confronted. 362 *N.J.Super.* at 343, 827 *A.*2d at 1157. Abrogating *Clinton Capital Corp. v. Straeb,* 248 *N.J.Super.* 19, 589 *A.*2d 1363 (Ch.Div.1990), we held that a lender who accelerates a loan could nevertheless collect a prepayment premium where the terms of the contract are clear and unambiguous, and there is no evidence of unreasonableness or sharp practices. *Id.* at 347, 827 *A.*2d at 1160–61. In upholding the fee, we said:

> [W]e can perceive no reason why the debtor should be relieved of the terms of the contract freely entered into. The terms were clear and unambiguous, the parties clearly experienced and sophisticated in loan transactions of this type. The certainty of the remedy provided by the clause undoubtedly affected the pricing of the loan. If we were to deem the clause unenforceable, we would be providing defendants with a better contract than they were able to negotiate for themselves; we decline to do so.
>
> [<em>Ibid.</em>]

This same reasoning was employed by the federal district court in *Norwest, supra,* in upholding the prepayment premium in that case. Distinguishing between default interest and the prepayment consideration which "reflect different economic realities and are part of today's commercial environment", *Norwest, supra,* 252 *F.Supp.*2d at 98, the court determined that "a prepayment premium is not a charge for the use of the money but consideration for something that unless bargained for a borrower is not entitled to; namely, the right to prepay." *Id.* at 97.

This reasoning is equally applicable here. The note's prepayment premium of one-half of one percent is neither punitive nor unreasonable as duplicative of default interest. As both

*Westmark* and *Norwest* recognized, a prepayment premium is not interest at all because it is not compensation for the use of money but a charge for the option or privilege of prepayment, and that such a prepayment premium is enforceable even when the lender accelerates the debt, so long as the loan documents clearly provide for the premium. *Norwest, supra,* 252 *F.Supp.*2d at 96; *Westmark, supra,* 362 *N.J.Super.* at 346–47, 827 *A.*2d at 1160–61. In other words, it is a sum representing a benefit that the borrower otherwise would not be entitled to. Here, the loan document clearly and unambiguously provides that upon default the lender could both accelerate the debt and collect the prepayment fee. This clause is valid and enforceable under New Jersey law.

We reach the same conclusion as to the default interest charge. We recognize the provision calls for a rate of six percent above the contract rate. However, this clause is only part of a complex commercial contract that was negotiated at arms-length between financially experienced and sophisticated parties. As the Court in *Metlife, supra,* observed:

> Because default and late charges are not liquidated damages at all in the traditional sense, but are simply part of the pricing of commercial loans between sophisticated parties, Metlife asserts that in the absence of unconscionability or illegality, those charges should be enforced. We agree in today's competitive market that ordinarily such charges are part of the cost of doing business. We, however, prefer to incorporate that factor into the "reasonableness" test. Courts are accustomed to dealing with the standard of reasonableness. We think that standard rather than an "unconscionability" standard provides an adequate safeguard for the lenders and better protection for the borrowers.
>
> [159 *N.J.* at 504–05, 732 *A.*2d at 504.]

Further, the principal amount of the loan in this case was more than $5 million, far in excess of the $1.5 million indebtedness in *Metlife* wherein the note contained a clause tying the default rate to the greater of fifteen percent or five percent above the prime rate. More significant, given defendant's prior default history on the loan in this case, the enhanced default interest rate negotiated in the 1991 mortgage modification agreement reflects the greater risk and higher potential of debtor delinquency facing the lender. Under these circumstances, we cannot say that the default inter-

est rate of six percent above contract rate was, on its face, unreasonable. We have no basis to conclude that the negotiated figure is not a reasonable amount to offset a portion of the damages incurred by plaintiff as a result of the delinquent loan.

Nevertheless, defendant contends he was entitled to an evidentiary hearing on the question of reasonableness. We reject this notion inasmuch as defendant never established a contested fact to be resolved and therefore, a plenary hearing was unnecessary in the context of this case. It is settled that a stipulated damages clause, such as that present here providing for contractual default interest and a prepayment fee, negotiated between sophisticated commercial entities, is presumptively reasonable. *Metlife, supra*, 159 *N.J.* at 496, 502, 732 *A.*2d at 503; *Westmark, supra*, 362 *N.J.Super.* at 340, 827 *A.*2d at 1155–56. *See also Norwest, supra*, 252 *F.Supp.*2d at 93–94. Thus, the party challenging the clause bears the burden of proving its unreasonableness. *Metlife, supra*, 159 *N.J.* at 496, 732 *A.*2d at 499–500.

In this case, the burden of proof rests squarely on defendant who had challenged the default interest and prepayment charges, yet had presented no evidence at all to overcome the presumptive reasonableness of these contractual fees to warrant a hearing. There was no proof, for instance, of fraud, duress, or other unconscionable acts or sharp practices on the part of plaintiff. Similarly lacking was any suggestion that defendant was deprived of the opportunity to bargain with plaintiff over the clauses. Also absent was any indication whatsoever that these clauses were at odds with common practice in a competitive industry or outside commercially acceptable rates. Particularly as to the default interest rate, defendant had offered no evidence that the charge was anything other than a reasonable estimate of the potential cost of administering a defaulted loan, and "the potential difference between the contract interest rate and the rate [plaintiff] must pay to secure a commercial loan replacing the lost funds." *Metlife, supra*, 159 *N.J.* at 501, 732 *A.*2d at 503. In

short, defendant made no preliminary demonstration of the need for a plenary hearing.

While the trial court in *Metlife, supra,* held a hearing to determine the reasonableness of the contractual fees, it did so because the defendant's two counterclaims, which were not dismissed, raised germane, specific and factually viable challenges to both the late charges and the default interest rate. In contrast here, defendant's answer containing affirmative defenses, which raised only non-specific challenges to undefined provisions of the mortgage note[4], was stricken and the matter was allowed to proceed on an uncontested basis. And in its opposition to plaintiff's motion for entry of final judgment, defendant provided no more information-much less prima facie competent proof-in support of his generalized, vague claims. Having provided no basis whatsoever to contest the presumptive reasonableness of the contractual fees, defendant was not entitled to a plenary hearing on the issue.

Lastly, defendant claims it was not given the opportunity to challenge the attorney fee award which it says was unreasonable and unsupported by certification. We disagree.

Pursuant to *Rule* 4:42–9(a)(8)(b), an affidavit is not required for the recovery of attorney's fees in mortgage actions. In any event, plaintiff's counsel submitted a certification stating that search fees for the foreclosure action were $685.40, and requested $7,500 to cover the fees and remaining expenses incurred. The trial court awarded $7,500 in attorney's fees, which is within the limitation set forth in *Rule* 4:42–9(a)(4).[5]

---

[4] The answer generally mentions that "[t]he subject Promissory Note and Mortgage contain certain provisions which are void as against public policy" and "[t]he Promissory Note and Mortgage are void in whole or in part due to the illegal and unconscionable penalties contained therein."

[5] In its pay off letter, plaintiff demanded $56,305.46 in attorney's fees, however, that amount was never incorporated in the final judgment of foreclosure and therefore is not before us on appeal.

■ Once again, defendant has presented nothing to demonstrate that the award of attorney's fees was unreasonable. Finally, we reject completely defendant's contention that the trial court should have conducted a hearing before making a fee award. The chancery judge was well acquainted with this matter, the fee award did not exceed the amount set by court rule and defendant offered no proof to show the fee was either unreasonable or computed incorrectly.

The order under review is affirmed.