**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4301-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CRAIG J. HUGHES, a/k/a
CRAIG J. AZIZ, MALIK AZIZ,
AMIN HARRIS, JEFFREY
J. HUGHES, PARKER J.
MALIK, JEROME A. MOORE,
JEROME OKNEAL,
ERIC PALMER, MALIK
PARKER and ALEX SAXTON,

    Defendant-Appellant.

_____

Submitted May 25, 2021 – Decided June 10, 2021

Before Judges Yannotti and Haas.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 18-08-0661.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Robert J. Carroll, Acting Morris County Prosecutor, attorney for respondent (John McNamara, Jr., Special Deputy Attorney General/Acting Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial judge denied his motion to suppress evidence, defendant Craig J. Hughes pled guilty to second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1). Defendant was sentenced to five years in prison, subject to a five-year period of parole ineligibility.

Defendant appeals the denial of his suppression motion and raises the following contention:

> THE TRIAL COURT ERRED WHEN IT HELD THAT THE COMMUNITY CARETAKING DOCTRINE JUSTIFIED THE MOTOR VEHICLE STOP. ACCORDINGLY, THE EVIDENCE DISCOVERED AND SEIZED DURING A SEARCH OF THE CAR SHOULD BE SUPPRESSED.

Having considered defendant's argument in light of the record and the applicable law, we affirm.

I.

The judge conducted an evidentiary hearing on defendant's motion at which Officer Michael Ambrose was the only witness. Defendant's sole argument at the hearing was "limited to only what the officer saw before he

initiated the stop" of the vehicle in which defendant was a front seat passenger. Defendant alleged that Ambrose had no legal justification for stopping the car and, therefore, any evidence seized after the stop should be suppressed. In rejecting this argument, the judge relied on the following facts presented at the hearing.

At approximately 1:00 a.m. on June 11, 2018, Ambrose was parked on Indian Road in his marked patrol car in a spot that had a "full view" of a supermarket parking lot located near Routes 53 and 80. The supermarket was closed at that late hour, but its lights were on and Ambrose testified that someone not familiar with the store's business hours might think it was open.

A GMC Envoy passed by Ambrose on Indian Road and went into the supermarket parking lot. Ambrose noticed there were four occupants in the car. The car drove to the front of the store, where a woman was standing near the door. The occupants stopped to speak to the woman for a moment, and then the car drove through the parking lot toward Route 53 and parked in a spot in the back of the empty parking lot. The driver turned the lights of the car off and the car remained there for no more than a minute.

From his past experience as a patrol officer, Ambrose knew that drivers sometimes became "lost or confused" in that area while attempting to get on

3

Route 80. Therefore, Ambrose "decided to pull into the parking lot and see if [the occupants of the Envoy] were disabled, lost, and see what they were doing in the parking lot."

As Ambrose drove into the lot, the Envoy backed up and started "traveling through the parking lot with its headlights off towards the exit to get back . . . onto Indian Road." Ambrose testified that he then decided to stop the Envoy "to, one, advise them to turn their headlights on, because it appeared they were going to be turning [o]nto a main road. Also, to see if they were lost or seeking any type of assistance, since they were parked in an area of the parking lot with the lights off and paused for a few minutes." On cross-examination, defendant's attorney asked Ambrose if he stopped the car for "any other reason." He replied:

> No. Not at all. It was to check to see. Like I said, I stated in my report, see if they were lost, if they needed some type of assistance, and also to make them aware that their headlights were not on before they entered a roadway, especially a highway.

When the Envoy was approximately 100 feet away from pulling out on the road, Ambrose activated his patrol car's overhead lights and the Envoy stopped in the parking lot. Ambrose got out of his car and approached the driver's side of the Envoy. He "started asking [the occupants] where they were coming from, if they were lost . . . ." The occupants "subsequently . . . informed

4

[Ambrose] that they were just trying to get back to Route 80." Starting a conversation with the driver, Ambrose "asked some other questions in regards to being lost about where they were coming from . . . ." The driver told Ambrose the group was coming from a party, but said "she wasn't going to tell" him "where the party was."

The woman who had been standing at the door of the supermarket then approached Ambrose and he recognized her as someone he knew from prior encounters while on patrol. The woman told Ambrose that the group had told her "that they were looking for a 7-Eleven."

Ambrose asked the driver for her license, but she did not have one with her. At this point, Ambrose noticed that one of the back seat passengers was wearing blue latex gloves on her hands, but she only laughed when he asked her why. Defendant, who was sitting in the front passenger seat, also declined to identify himself.

Another officer arrived at the scene and Ambrose began speaking to defendant on his side of the Envoy. From that vantage point, Ambrose saw a black bag that was resting against the center console of the car on the passenger side. Defendant attempted to cover the bag with his hand, but Ambrose "observed what appeared to be a police scanner, binoculars[,] and a screwdriver

inside the bag." Based on Ambrose's training, he "identified [these items] as burglary tools."

Ambrose asked defendant to get out of the car and placed him under arrest. The officers then removed the other occupants and arrested them. Once the occupants left the car, Ambrose saw a handgun in plain view inside the car. The police located another gun inside the Envoy during a subsequent search.

While the occupants of the Envoy were later being processed at the police station, two of them "admitted to conspiring with [defendant and the fourth passenger] to rob a convenience store on their way" to a casino in Pennsylvania. A Morris County grand jury thereafter returned an eight-count indictment charging all four occupants with two counts of second-degree possession of a weapon for an unlawful purpose; two counts of second-degree unlawful possession of a weapon, and second-degree conspiracy to commit robbery. In separate counts, the indictment charged defendant with fourth-degree possession of a radio to intercept emergency communications while committing or attempting to commit a crime; and the offense to which he pled guilty, second-degree certain persons not to possess weapons.[1] The indictment also charged

---

[1] As part of his plea agreement, the State moved to dismiss the remaining charges against defendant at the sentencing hearing and the judge granted this request.

the driver of the Envoy with second-degree certain persons not to possess weapons.

In addition to the officer's testimony, the State presented a surveillance video of the supermarket parking lot and a "MVR recording" taken by the dashboard camera in Ambrose's patrol car. Both videos were consistent with Ambrose's account of his actions before and during the stop.

At the conclusion of the hearing, defendant asked that the evidence seized from the Envoy be suppressed because Ambrose did not have the reasonable suspicion of criminal activity necessary to conduct a motor vehicle stop. According to defendant, he and the other occupants of the car simply pulled into a parking lot, parked for about a minute, and then began to drive away. Although defendant conceded the driver did not turn on the car's lights as she drove through the lot, he asserted there was no traffic violation because the car had not yet reached the highway.[2]

In his thorough oral opinion, the judge agreed with defendant that the officer did not have "a reasonable and articulable suspicion that the driver of the

_____

[2] In this regard, N.J.S.A. 39:3-47(a) states that it is a motor vehicle violation for a person to "drive, move, park or be in custody of any vehicle . . . on any street or highway during the times when lighted lamps are required . . . ." (emphasis added).

vehicle or its occupants [were] committing a criminal or disorderly persons criminal offense or [were] committing a motor vehicle violation" prior to stopping the Envoy. However, this legal conclusion was not the end of the inquiry.

The judge found that Ambrose credibly testified that he stopped the Envoy because he believed the occupants were lost as other drivers in that area of the town sometime became when looking for Route 80. The judge also credited Ambrose's testimony that he wanted to make sure that the occupants did not drive out of the parking lot onto the highway without their car lights on.

The judge noted that Ambrose's beliefs were fully reasonable. He stated:

> [T]he testimony . . . revealed the officer did not stop the vehicle for no reason and he did articulate in the testimony a number of elements of his thinking that seemed to be borne out by the testimony and the circumstances. One of the things he noted was that the activity of the vehicle suggested to him that there might be a problem and he specifically referred to a thought that it might be lost. He referred to that area being near where Route 80 is located and, again, the vehicle pulled into the parking lot, interacted with a pedestrian, pulled to the far end of the parking lot for a brief moment and then started to exit . . . the parking lot. So at the point at which he stopped . . . stopped the vehicle . . . he had seen some activity that suggested to him that there might be a problem and he specifically articulated the vehicle being lost and, secondly, he articulated that the lights were not on at that point and that was something he noted.

Under the totality of these circumstances, the judge concluded that Ambrose was justified in stopping the Envoy based upon the community caretaking exception to the warrant requirement that exists when a police office is engaged in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973); see also State v. Diloreto, 180 N.J. 264, 275 (2004). As the judge observed:

> It might be a different case if the vehicle had never proceeded and stopped briefly at the bottom of the parking lot. It might be a different case if the vehicle had not had its lights off as it was approaching the exit, but those are the circumstances established by the record.

Instead, the judge found that the officer simply wanted to provide the assistance he thought the occupants of the vehicle needed to get to where they were going in a safe manner. Therefore, the judge determined that Ambrose's conduct was objectively reasonable under the totality of all of the circumstances existing before he stopped the car.

The judge subsequently denied defendant's motion for reconsideration in which defendant argued that Ambrose's testimony concerning his belief the occupants of the Envoy were lost and that he wanted to protect them from going

out on the highway without their car lights on was a pretext designed to excuse an illegal stop. In rejecting this contention, the judge stated "it does not appear to be a situation that there was an ongoing criminal investigation and that a subject or a zone of privacy was targeted pretextually or some action." Thus, the judge again concluded "that the totality and the cumulative circumstances that prompted the police action were reasonably understood to be within . . . a community caretaking function."

## II.

On appeal, defendant argues that the police officer's stop of the car was not justified under the community caretaking exception to the warrant requirement. We disagree.

When reviewing an order granting or denying a motion to suppress evidence, we accept a trial court's findings of fact if they are supported by sufficient credible evidence in the record. State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference should be afforded to a trial judge's findings when they are "substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). If the trial court's decision is based upon a legal conclusion, "we conduct

10

a de novo, plenary review." State v. Rockford, 213 N.J. 424, 440 (2013). "A trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425.

"The community-caretaking doctrine recognizes that police officers provide a wide range of social services outside of their traditional law enforcement and criminal investigatory roles." State v. Scriven, 226 N.J. 20, 38 (2016) (internal quotation marks and citations omitted). The doctrine provides an independent justification for intrusions into a citizen's liberty that would otherwise require a showing of probable cause or reasonable and articulable suspicion of criminal behavior. Diloreto, 180 N.J. at 276. In applying the doctrine, courts have long recognized the importance of law enforcement's concerns for the proper and safe operation of automobiles. See Cady, 413 U.S. at 441 (establishing the doctrine within the context of state regulation of vehicles). Our Supreme Court has found that the community caretaker role permits officers to "check on the welfare or safety of a citizen who appears in need of help on the roadway without securing a warrant or offending the Constitution." Scriven, 226 N.J. at 38.

The doctrine entails a two-part inquiry. First, a court must ask whether the officer has reacted to an objectively reasonable community concern. Id. at 39 (stating that officers must have an "objectively reasonable basis" to stop a vehicle to provide aid or check a motorist's welfare). That concern must serve as a distinct motivation for the officer's conduct, divorced from any desire to further a criminal investigation. In other words, community caretaking may not serve as a pretext for a warrantless intrusion into a citizen's liberty that does not satisfy another warrant exception. State v. Bogan, 200 N.J. 61, 77 (2009). However, the "divorce" between the two police functions "need only relate to a sound and independent basis for each role, and not to any requirement for exclusivity in terms of time and space." Ibid. (citation omitted).

Second, the court must discern whether the actions taken by an officer pursuant to his community caretaking remained within the limited scope justified by the caretaking function. As with all police stops, the officer's conduct must be "reasonably related in scope to the circumstances which justified the interference in the first place." State v. Dickey, 152 N.J. 468, 476 (1998) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). Moreover, an officer's "community caretaking inquiry must not be 'overbearing or harassing in nature.'"

12

State v. Drummond, 305 N.J. Super. 84, 89 (App. Div. 1997) (quoting State v. Davis, 104 N.J. 490, 503 (1986)).

As these legal standards imply, the two-part application of the community caretaking doctrine is a fact-sensitive inquiry. In several cases, we have found that the police had an objectively reasonable basis to engage in community caretaking. For example, in State v. Cohen, 347 N.J. Super. 375, 380-81 (App. Div. 2002), we stated that the police were authorized to conduct a car stop to inspect darkly-tinted windows that obstructed vision and posed an apparent "hazardous vehicular condition."

In State v. Martinez, 260 N.J. Super. 75, 77-78 (App. Div. 1992), we authorized a stop of a car traveling less than ten miles per hour in a twenty-five mile per hour residential zone without flashers at 2:00 a.m. because there were reasonable concerns that the driver was in distress, the vehicle was disabled, or the slow driving posed a hazard to other motorists. And in State v. Goetaski, 209 N.J. Super. 362, 364-65 (App. Div. 1986), we held the officer was justified in stopping a motorist driving slowly at 4:00 a.m., with a left blinker flashing, while on the shoulder of a rural state highway.

We also relied upon the community caretaking doctrine in ruling that the police were authorized to stop a car at 12:20 a.m. after it was weaving within its

lane at thirty-six miles per hour in a forty-five mile per hour zone.  State v. Washington, 296 N.J. Super. 569, 571-72 (App. Div. 1997).  The police were also authorized by the doctrine to investigate a parked, darkened car at a closed car wash at 11:44 p.m.  Drummond, 305 N.J. Super. at 86-88.  In both cases, the officers suspected that the occupants might be in distress, pose a threat to others, or need assistance.

On the other hand, distinguishing Goetaski, Martinez, and Washington, the Court in Scriven held the trial court correctly determined that the community caretaking doctrine did not authorize an officer to stop a motorist who was operating his high beams under circumstances that did not affect oncoming vehicles or otherwise affect the safety of others.  Scriven, 226 N.J. at 36, 38-40.  The Court noted that the driver's use of his high beams "did not suggest that the driver of the car was 'impaired' or that the vehicle had a 'problem.'"  Id. at 39.  The Court recognized that an officer may instruct a driver to dim high beams if their brightness impairs an officer's or road workers' ability to perform tasks; yet, the officer in Scriven stopped the car for a different reason–he mistakenly and unreasonably believed the driver violated a motor vehicle law.  Id. at 39-40.

Similarly, in State v. Cryan, 320 N.J. Super. 325, 327, 331 (App. Div. 1999), we found that the community caretaking doctrine did not justify a stop

14

when the driver merely paused for about five seconds after a stoplight turned green at approximately 4:24 a.m.  Simply put, that delay was not enough for an objectively reasonable officer to conclude that the driver was experiencing difficulty, thereby posing a hazard to himself or others.  Id. at 331.

Applying these principles to the totality of circumstances presented in this case, we discern no error in the trial court's decision.  Given our standard of review, we are constrained to defer to the trial judge's credibility determination that Officer Ambrose stopped the Envoy in order to advise the driver that she was about to turn onto a highway without her lights on and to see if the group was lost and needed assistance in finding their way.

We also discern no error in the judge's conclusion that the stop furthered the community caretaking purpose.  Ambrose knew from past experience that drivers became "lost or confused" in the area of Indian Road while looking for Route 80. Judged under an objectively reasonable standard, the Envoy certainly appeared to be lost when it entered the vacant parking lot at 1:00 a.m.  The occupants of the car had a conversation with a woman standing at the front of the supermarket and then pulled into the very back of the parking lot.  After parking for about a minute, the car began pulling out of the parking lot toward the highway without its lights on.  Under this set of facts, we are satisfied that

15

the officer properly stopped by the car in order to assist the occupants of the Envoy in finding their way safely to their next destination.

Ambrose also properly stopped the Envoy under the community caretaking doctrine because it was about to drive onto the highway without its lights on. While the driver had not committed a traffic violation under N.J.S.A. 39:3-47(a) by driving without lights in the parking lot, Ambrose credibly testified he was concerned for the safety of the occupants if they left the parking lot without realizing their lights were off. Had they done so, the driver would have put the safety of herself, her passengers, and the public in other vehicles in immediate danger.

Unlike cases involving a slow moving vehicle, where an officer may only suspect equipment trouble or other distress, Ambrose could see the Envoy did not have its lights on. Moreover, unlike in Scriven, Ambrose did not stop the car merely to enforce a traffic law. Instead, the judge found that the officer's purpose was to protect the occupants from the obvious jeopardy they faced if they entered the highway without the necessary illumination.

A police officer need not simply permit a community hazard to pass by. Scriven, 226 N.J. at 38. Consistent with the principles of the community caretaking doctrine, we are satisfied that the officer was authorized to conduct

a traffic stop to advise the Envoy's driver that her lights were off and to inquire if she and the other occupants were lost. Therefore, the judge properly denied defendant's motion to suppress the evidence found following this lawful stop.[3]

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] As already noted, defendant's suppression motion was limited to a challenge to the officer's authority to stop the Envoy. He did not challenge the officer's plain view observations of the burglary tools or the handgun after he stopped the car.

17